# THURZA CONNER, Appellant, v. JOSEPH E. SKAGGS et al.

### Division One, July 3, 1908.

1. WILL: Undue Influence. The testator notified the cashier of a bank that he wished him to draw his will, and thereafter, eight years before his death, he appeared at the bank, and gave specific directions and memoranda as to how he wished to dispose of his property, and the cashier, using a form in a book or an old will as a guide, drew up the will as testator directed, disinheriting plaintiff, for that, as the will recites, "she having married contrary to my express wishes." Before it was made testator told others that he intended to make it as it was made, and after it was made he told others that he had made it as it turned out to be. Two years later he had the same cashier to make a codicil, changing the executor, and afterwards he told others that he had changed the codicil as it turned out to be changed. The will and codicil were left in the keeping of the cashier, and six years after the codicil was made the testator died. *Held*, that the court properly instructed the jury to find that the will was not the result of the undue influence of the cashier.

2. ———: **Incapacity: Erroneous Opinion: Joining Church.** The fact that testator in his old age stated to a minister when his grandchild joined the church that he had never sworn an oath prior to his uniting with the church at the age of eighteen and thereafter he became very profane, and the fact that he argued, from his own experience, that joining the church tended to a lowering of moral standards, etc., is no evidence that he was incapacitated to make a will. Faulty reasoning now and then is no evidence of testamentary incapacity.

3. ———: ———: **Insane Delusion: Definition.** This definition is approved: "An insane delusion is an unreasoning and incorrigible belief in the existence of facts which are either impossible absolutely, or, at least, impossible under the circumstances of the individual. It is never the result of reasoning and reflection; it is not generated by them, and it cannot be dispelled by them; and hence it is not to be confounded with an opinion, however fantastic the latter may be."

4. ———: ———: ———: **Wrongful View of Son-in-Law: Explosive Temper.** The fact that testator was violently opposed to the clandestine courtship and marriage of the daughter whom he disinherited; that he considered the man she married was "a drunkard, a gambler and a morphine fiend;" that his belief was unfounded, yet was based on statements made to him by others; that he had an explosive and violent temper, and when the daughter married, he was deeply wounded, and went into a violent rage and in the height of his bitterness determined he would disinherit her, which he did by will ten days later; that they subsequently became reconciled and she was again received into the bosom of the family, and that thereafter he caused to be added to the will a codicil, changing the executor and otherwise ratifying and confirming the will, which clause was read over to him, and that the codicil was added on the next day after he had been urged to change the will so as to restore the daughter to a child's share, are not evidence of an insane delusion or of senile monomania, where there is no evidence that he was in a paroxysm of temper and rage when the will was made, and there was evidence that after the codicil was added he told others what changes were made by it and after his death the changes were found to be exactly as he said they were.

Appeal from Platte Circuit Court.—*Hon. A. D. Burnes,* Judge.

AFFIRMED.

*George W. Day, Anderson & Carmack,* and *Roland Hughes* for appellant.

(1)  The defendants, or proponents of the contested instrument, not the plaintiff, were, under the law, charged with the burden of showing, among other things, testamentary capacity.  This burden remained with them throughout the trial and did not, as has been sometimes supposed, shift, after the making of what is called a prima-facie case.  Norton v. Paxton, 110 Mo. 456; Carl v. Gabel, 120 Mo. 283; Moore v. McNulty, 164 Mo. 119; Southworth v. Southworth, 173 Mo. 72; Lorts v. Wash, 175 Mo. 503.  (2)  When there are facts established from which a jury may reasonably draw legitimate inferences tending to sustain an issue, the court should not interfere.  Sehr v. Lindemann, 153 Mo. 289.  (3)  Moreover, in passing upon the capacity of a person to make a will, the will itself and all of its provisions may be considered by the jury, and, while the fact that it is apparently unjust to some of the children is not, of itself, sufficient to invalidate it, yet it is a circumstance to be considered with other facts.  Young v. Ridebaugh, 67 Mo. 574.  (4)  Our Statute of Descents is the legal standard, as it is also the human standard, of how property should be distributed upon the death of its owner; and where, as in this case, a testator virtually disinherits a child, such gross inequality furnishes an additional ground for placing upon the proponents of the will the *onus* of establishing its validity.  Gay v. Gillilan, 92 Mo. 264.  (5)  We have no instrument by which we may assume to measure the extent of mental capacity.  Each case must be ruled according to its own peculiar facts and circumstances.  Brinkman v. Rueggesick, 71 Mo. 553.  (6)  Where a person imagines something extravagant to exist, which really has no existence whatever, and he is incapable of being reasoned out of his false belief, he is in that re-

spect insane, and, if an instrument, testamentary in form, is produced by such delusion, it is invalid as a will. Benoist v. Murrin, 58 Mo. 307; Knapp v. St. Louis Trust Co., 199 Mo. 688; Holton v. Cochran, 106 S. W. 1035. (7) "Intelligent knowledge by a testator that his will would disinherit some of his children, is not inconsistent with a delusion in regard to them, which led to their exclusion." Bitner v. Bitner, 65 Pa. St. 347. (8) The law does not require any particular degree of understanding in a person making a will, but such person must have sufficient capacity to intelligently know what disposition he is making of his property. Harvey v. Sullens, 56 Mo. 372. (9) It is always the province of the jury to make deductions and draw inferences from evidence that permits of more than one just conclusion, even in will cases. Walton v. Kendrick, 122 Mo. 504; Sehr v. Lindemann, 153 Mo. 276; Fulbright v. Perry County, 145 Mo. 432; Cash v. Lust, 142 Mo. 630; Tibbe v. Kamp, 154 Mo. 545; Schierbaum v. Schemme, 157 Mo. 1.

*Wilson & Wilson* for respondents.

(1) Where, in a will contest, the subscribing witnesses testified that the testator was of lawful age and of sound mind, as well as to the due execution of the will, such evidence established a prima-facie case for proponents, and shifted and rested the burden to contestants of establishing testator's incapacity, or that the execution of the will was the result of undue influence. Holton v. Cochran, 106 S. W. 1064; Harris v. Hays, 53 Mo. 96; Fulbright v. Perry County, 145 Mo. 442; McFadin v. Catron, 138 Mo. 213; Jackson v. Hardin, 83 Mo. 175; Maddox v. Maddox, 114 Mo. 35; Carl v. Gabel, 120 Mo. 283; Tibbe v. Camp, 154 Mo. 545; Riggin v. Westminster College, 160 Mo. 579. (2) The rule in this State is that one who is capable of

comprehending all his property, and all persons who reasonably come within the range of his bounty, and who has sufficient intelligence to understand his ordinary business and to know what disposition he is making of his property, has sufficient capacity to make a will. Holton v. Cochran, 106 S. W. 1064; Riggin v. Westminster College, 160 Mo. 579; Jackson v. Hardin, 83 Mo. 175; Benoist v. Murrin, 58 Mo. 322; Gordon v. Burris, 153 Mo. 231. (3) When there are facts established from which the jury may reasonably draw legitimate inferences tending to sustain an issue, the trial court should not interfere. But when, as in this case, there is no substantial evidence of incompetency, it was the duty of the trial court—as it did do—to direct a verdict for the proponents of the will. McFadin v. Catron, 138 Mo. 213; Hamon v. Hamon, 180 Mo. 702; Southworth v. Southworth, 173 Mo. 59; Jackson v. Hardin, 83 Mo. 175; Maddox v. Maddox, 114 Mo. 35; Riley v. Sherwood, 144 Mo. 369; Sehr v. Lindemann, 153 Mo. 290; Martin v. Bowden, 158 Mo. 393; Woods v. Carpenter, 166 Mo. 487; Catholic University v. O'Brien, 181 Mo. 68; Doherty v. Gilmore, 136 Mo. 422; Gordon v. Burris, 141 Mo. 614; Archambault v. Blanchard, 198 Mo. 429; Farmer v. Farmer, 129 Mo. 536; Defoe v. Defoe, 144 Mo. 466; Cash v. Lust, 142 Mo. 644; Riggin v. Westminster College, 160 Mo. 570; Berberet v. Berberet, 131 Mo. 411; Crowson v. Crowson, 172 Mo. 691. (4) The law presumes that a testator was possessed of a sound and disposing mind, and it rests upon him who disputes the validity of a will to overcome this presumption by persuasive evidence. Jackson v. Hardin, 83 Mo. 182; Maddox v. Maddox, 114 Mo. 35; Cash v. Lust, 142 Mo. 644; McFadin v. Catron, 138 Mo. 226. (5) And when the testator comes within the rule of testamentary capacity laid down above, he has the right to make an unreasonable, unjust and injudicious will, and his

neighbors have no right, sitting as a jury, to alter the disposition of his property simply because they may think the testator did not do justice to his family connection. Maddox v. Maddox, 114 Mo. 47; Jackson v. Hardin, 83 Mo. 185; Mackall v. Mackall, 135 U. S. 171; Berberet v. Berberet, 131 Mo. 411; Tibbe v. Kamp, 154 Mo. 584.

LAMM, J.—In a statutory proceeding contesting the will of Joseph Skaggs, deceased, wherein the issue was *devisavit vel non,* the trial court gave a demurrer to the evidence in the nature of an instruction at the close of plaintiff's case. Refusing to set aside the verdict so coerced, the court rendered judgment probating the will in solemn form. Thereat, plaintiff appeals.

The will bears date of February 28, 1895. Its seventh item runs: "To my daughter, Thurza, wife of Wm. Conner, I give only one dollar, she having married contrary to my expressed wishes, I wish to discriminate against her." The eleventh item nominates his wife, Harriet E., as executrix without bond. She having died, he executed a codicil on the 18th of June, 1897, whereby he changed the eleventh item by appointing his son, Joseph Edward, executor, and ratified the will in all other respects. Following that, he died on the 11th day of March, 1903. Thereupon, his will and codicil were probated in common form; and thereafter, on January 8, 1904, contest proceedings were begun by the disinherited married daughter against the beneficiaries, to-wit, testator's children and certain grandchildren.

The cause was tried on an amended petition, charging in effect (1) that at the several times of signing the will and codicil the testator did not have testamentary capacity; and (2) that the will was the product of the undue influence of one Edwin Thatcher—in short, was his will and not testator's.

Of these in reverse order.

I.  Of undue influence.

It appears that said Thatcher was cashier of a bank at Smithville, a near-by town in Clay county at which testator did business, and he drew, witnessed and kept both will and codicil in the vault of his bank until produced for probating.

Plaintiff's counsel submit the case on the theory that, because of the strength of their position on the issue of testamentary incapacity, they hesitate to discuss the issue of undue influence.  Conceding that so, yet counsel might well have gone one step further and put the point on the theory as well that there was no substantive evidence to sustain the averment.  The record shows there fell a time when Thatcher was notified by testator that he would need his services in drafting a will.  Some later he came into the bank in pursuance of that notification.  It appears that Thatcher had no interest or wish of his own to subserve, had no bias in favor of one heir or against another.  The truth is, he had to deal with a self-willed, masterful, pragmatical old man who, in and of himself, knew what he wanted and who with no uncertain hand chalked down the line he was to follow, by giving him directions and memoranda upon which the will was to be drafted.  Whereupon, using a form in a book or some old will as a model, he drafted the will in the counting room of the bank during business hours, as directed.  Under substantially like circumstances he drafted the codicil.

It is sought to support the theory of undue influence by an ingenius argument, doing credit to the forensic skill of counsel.  But on this record it has not an iota of substantive testimony to stand on.  To the contrary, on plaintiff's own proof, the will is conclusively shown to be in all its provisions peculiarly the

will of testator. Not only did he preside over its genesis, but he told others before it was made that he intended to make it as it was made. He told others after it was made that he had made it as it turned out to be. And *after the codicil, he told others he had changed his will as it turned out to be changed.*

Plaintiff's evidence, then, putting the fact beyond question that the will assailed is her father's will, that she was disinherited of his set purpose formed eight years before his death, and it sufficiently appearing that Thatcher had nothing to do with originating or nursing that purpose, the issue of undue influence is clearly not within the case made on the facts.

Accordingly, the court was justified in taking the case from the jury on that issue.

II.  Of testamentary capacity.

(a)  In determining the point, it is well at the outset to define the issue as sharply as the record will permit. The charge in the petition is general, to-wit, that: "He, the said Joseph Skaggs, was of unsound mind and had not sufficient understanding to comprehend the business he was then engaged in, nor who were the natural objects of his bounty, nor what property he had, nor the disposition he was making of it by said paper writing."

That general charge was broad and flexible enough to admit proof (if any) showing *senile dementia—i. e.,* the recurrence of second childhood by mere coincident decay of bodily and mental powers. But nothing of the sort is within the scope of the proof educed, nor is it in the line of argument advanced by learned counsel.

Neither is there claim or substantial evidence of general derangement of mind. There was a solitary incident put in evidence that (if it had been fortified by a course of conduct) might have a little tendency

that way. Shortly before his death in 1902, it seems some one had endeavored to persuade his grandchild of tender years to join the Baptist church. Mr. Skaggs was opposed to that and, in a talk with a minister, told him that he (Skaggs) had never sworn an oath until he had joined the church, when about 18 years of age. The testimony is very brief and we gather from it that the old gentleman was of opinion that his joining the church had a bad effect on him— lowered his moral tone and stamina. His language was, "I got to be one of the most profane men *after that* that you ever saw." The doctrine of "falling from grace" (using the term reverentially) is stoutly maintained by one school of polemics and as stoutly doubted by another, who maintain 'the dogma: Once in grace, always in grace. But no school of theologians or doctrine of the law known to me assert the proposition that falling from grace is, in and of itself, evidence of entire mental unsoundness. If a man today pious, mild and kindly, a just man of discreet walk and conversation, alive to the duties and amenities of life, becomes tomorrow a sot, incontinent, impious, unjust, cruel, profane—in effect, a degenerate—such a radical revolution has been judicially commented on as evidence tending to show impairment of mind to a degree which may affect his capacity to make a valid will unnaturally disposing of his property; but the testimony here has no tendency to prove such condition. The incident under review may be dismissed with the observation that the conclusion drawn by Mr. Skaggs was quite faulty on the proposition under discussion with the good minister, but it would be an alarming proposition to assert that faulty reasoning now and then was evidence of general mental aberration. Such an arrow, shot at a venture, would hit unexpected marks. Counsel make no claim that such was the fact. To the contrary their proof was directed to establish-

ing a form of *monomania*, viz., a derangement of Mr. Skaggs's mind in regard to a single subject only—an alleged insane delusion, hereinafter considered. Contestant put upon the stand an array of witnesses who knew the father long and well. Each and all of them testified to his general soundness of mind. He was shown to be a frugal, hard-working, capable, honest man, sixty-odd years old when the will was written, owning and managing a small farm in Platte county. No one impugns his ability to attend to his business affairs with vigor and circumspection and he did attend to them without the aid of any supervision to the day of his death. The evidence allows room for no inference that he did not have his children in mind, know the nature and extent of his property and exactly what he wanted to do with it by will—unless plaintiff's theory of an insane delusion, operating in the execution of the will and codicil, finds such support in the proof as would carry the case to the jury. On that sole question, the case hinges.

(b)   Attending to it, the case made is substantially this: ı

William Conner lived in the Skaggs neighborhood. At a certain time he was paying court to Lucy Skaggs, an elder sister of Thurza. The testimony leaves no room for doubt that the father got the notion that Conner was an undesirable son-in-law, unworthy of his daughter; and so it fell out that he vehemently opposed his attentions to Lucy Skaggs, with the result either that it shut off the courtship, or that it was brought to an end by Conner's own wish. Indeed, there is testimony pointing to the fact that he was not sincere in his attentions to Lucy, but was secretly at the same time paying court to Thurza, then a mere child sixteen years old; and that when the father's opposition took visible form, he, to use plaintiff's own words, "threw her (Lucy) overboard," and continued

a sly courtship of Thurza for a long time. This, finally coming to the father's knowledge, was deeply resented by him. As formulated, his objections to Conner were that he was "a drunkard, a gambler and a morphine fiend." At the trial there was testimony tending to show that the father's said estimate was erroneous. It was shown, however, that he (presumably busying himself to ascertain the character of a young man determined to become the husband of his daughter) was told that Conner had the foregoing faults. From what he was told by others he believed that Conner would not support his daughter properly and that she was marrying beneath her station in life. But this was not all that influenced Skaggs. It is plainly to be seen that he was touched to the quick in his pride and stirred to the depths of his soul with resentment over the fact that Conner and his daughter were proceeding with a clandestine courtship contrary to his will and protest. We take it, it ought not to be seriously contended, that, within reason, a father's judgment is not worth something in "an affair of the heart." We take it, that the road to disobedience is open to a daughter, but that road has trials and tribulations, she elects to put up with, if taken. On the other hand, this father lacked tact and gentleness. The details of his tactless and rude attempts to bend his daughter's will to his, need not be spread of record. After four or five years, Thurza, leaving home, married Conner on February 19, 1895, and thereafter for a time became a stranger in her father's house. Many witnesses testified to Mr. Skaggs's exceeding and sore bitterness over this event, and for some time he did not speak of it without falling into a very ecstasy of rage, sometimes accompanied by such singular physical phenomena as "foaming at the mouth," "pawing the grass," and cursing and swearing.

The record makes it clear that in the height of his

bitterness he determined to disinherit his disobedient daughter. He told others he would do so. Accordingly, on the 28th of February (the month of the marriage) the will in contest was executed, doing that very thing. Two years went by and the mother, long an invalid and fast nearing the end of her days, persuaded the father to allow Thurza to visit home. She did visit there and apparently resumed her old place in her father's affections. It is plain, too, that the fury of his anger against her husband was spent. The two men became (at least on the surface) friends. Testator lived on his farm. Thurza with his other children often went there and ministered to the mother until she died, and afterwards to the father until he died. Shortly after the mother's death, in 1897, and after the reconciliation, the codicil in question was made.

In this connection it is proper to say that Mr. Skaggs was afflicted with an infirmity of temper—a temper brittle and peppery to a degree and which he gave way to at times without check. When under the influence of this (to him) master and elemental passion, it lashed him into such a crest of fury that he became literally beside himself for the time being— "flashed like powder" as one witness put it. It is insisted that when the will was made he was under the influence of uncontrollable temper, but that when he went to make the codicil he was clothed in his right mind and that he intended to change his will so that Thurza might inherit, but that, by some unhappy inadvertence of the scrivener, that end was not reached. But we do not find such inadvertence in the record, nor do we find that when he made his will he was in any transport of anger. Shortly after his wife died, a Mrs. Lutes became his housekeeper and on the day the codicil was executed these two had a talk. Mr. Skaggs was sick and was taking medicine. He informed her

that he was going to town to change his will. The good lady evidently knew that he had disinherited Thurza, and, with all her might and main, she threw the weight of her advisory views in the scales in favor of a change in the will in that regard. The upshot of that talk was as follows: "So I says to him, 'You ain't able to work.' He says, 'I ain't going to work, Aunt Zade.' He says, 'I am going to change my will. Thurza can get her part of her mother's estate, but I don't want Will Conner to have it.' I says, 'You can fix it so Thurza and her heirs will get it, but not Will.' He knew Thurza had as good a right as anybody, but then he didn't want Will to have it. So finally *he told me to go back to the house and tend to my own business and he would fix this thing as he wanted it.* I says, 'Well, you must remember that Thurza is your own child and I wouldn't forget my own flesh and blood,' and then he flew off and went on to town and he wasn't gone very long."

On the road to town he called at the home of his daughter, Lucy. Her deposition was taken by plaintiff and she gave this version of her conversation with her father and of a former conversation with her mother:

"Q. What did you say to him then that night when he called you out to the fence and told you that he was going to change his will so that all his children would share alike? A. I didn't say that he said he would make it so that we would all share alike.

"Q. What did you say he said? A. I said that he said, 'I am going down to make the will to you children,' and I said, 'You are?'

"Q. Didn't you ask him on that occasion if he had not already so made it? A. I did not.

"Q. You understood at that time, did you not, that he had cut Thurza off without anything? A. I didn't know he had a will.

"Q. Didn't your mother, before she died, tell you and your brother Ed that if your father had made a

will cutting Thurza off that you and she should make it right with her? A. She did not, no, sir.

"Q. Didn't she tell you that she had understood that your father had made a will leaving Thurza out of any part of his estate? A. She said she was afraid he had, but nothing in regard to us making it all right.

"Q. Didn't you say to Mrs. Conner that your mother had said to you that if your father had left Thurza out of the will she requested that you and Ed should see that Thurza got her share? A. I didn't say that my mother requested, but I said that we would, Ed and I would do all in our power, and so we have."

Testator, as said, went to town and called on Thatcher to write the codicil. He was laboring under no excitement. The only change he requested to be made was a change from the mother as executrix to the son as executor. It seems the form book used by the scrivener contained a suggestion that when a codicil to a will was executed it was proper to ratify the original will in all particulars left unchanged. That form was followed in this instance and the codicil was read over to the testator and then signed and published by him.

There is no word of testimony indicating that he did not then know and realize that he had disinherited Thurza, or that he did not then know and realize that he had the full right to so alter his will as to eliminate the disinheriting clause. In fact, he was in the very act of changing his will, and the question of disinheriting Thurza was freshly in mind as shown by his conversation with Mrs. Lutes. It is apparent, therefore, that his rage over her disobedience was over and gone and that what he did at that time was done intentionally. It is apparent, moreover, that what he then did he deliberately stood by for five more years until he died. The proof shows that shortly after he made the codicil he told one of plaintiff's witnesses he had made it and he mentioned the particulars of the change.

The case then is presented to us on a record showing that after his hot anger cooled off and his resentment had measureably passed, his deliberate and settled judgment caused him to live up to his vows of disinheritance, by preserving his will establishing that fact—all this though it would have been far nobler to have taken another course.

Black's L. Dict. (tit., "Delusion"), says: "An insane delusion is an unreasoning and incorrigible belief in the existence of facts which are either impossible absolutely, or, at least, impossible under the circumstances of the individual. It is never the result of reasoning and reflection; it is not generated by them, and it cannot be dispelled by them; and hence it is not to be confounded with an *opinion,* however fantastic the latter may be."

That definition meets our approval. Measured by that definition, we cannot see the trace of an insane delusion leading up to either will or codicil. Testator's opinions as to the soundness of Mr. Conner's morals, may have been grossly narrow and unjust, but there was no insanity about it. It is natural and usual for men to act on what they are told by others, in whom they trust. The solicitude of the father was natural. A clandestine courtship in the teeth of parental protest is a most dangerous domestic experiment. Mischief and unwholesomeness lurk in the shade of concealment. The resentment of the father was most human and natural though extravagantly exhibited. That he did not rise to the lofty and divine plane of complete forgiveness when time had healed his wounds, is unfortunate; but is still natural and human—not insanity.

This court has so often been called upon to assert that the prime object of the Statute of Wills is to permit the owner of property, not shown to lack testamentary mind and memory, to take his property out of the Statute of Descents and Distribution and to dispose

of it as a chancellor sitting on the equities of his own children and his domestic affairs, that it would seem useless to go into an extended discussion of the reasoning sustaining that elementary proposition.

In Richardson v. Smart, 152 Mo. l. c. 636, it was well said by MARSHALL, J., "The sum of the whole matter is that it was his property. He had a right to do what he pleased with it. He is not shown by the record to have been incapable of knowing what he was doing. He has acted, and what was said in reference to a will by the Supreme Court of Michigan applies equally as well here. 'If a man's acts, by reason of such incidents as have been shown in this case, make such acts the subject of post-mortem determination, dependent upon the whims or caprices of a jury, then it may as well be said by him who wishes to convey his property, "I wish my property to go so and so, and hope that a jury will upon the subject think the same as I do, and confirm my act." ' [Lynch v. Doran, 95 Mich. l. c. 409.]" See remarks of Fox, J., *arguendo,* in Hughes v. Rader, 183 Mo. l. c. 707, and GANTT, J., *arguendo,* in McFadin v. Catron, 138 Mo. l. c. 225, *et seq.* The writer of this opinion had occasion to consider that subject in Meier v. Buchter, 197 Mo. l. c. 86,*et seq.,* and he can add nothing of his own to what was there said.

There being no undue influence whatever, there being no form of *senile dementia,* or form of monomania operative in the execution of the will or codicil, and the testator being of testamentary capacity, the court, *nisi,* did right in giving a peremptory instruction after the proponents of the will had made a prima-facie case and contestant had introduced her full proof on the issue of fact.

There is inferential evidence, as we see it, that the mother, when the hand of death rested heavily on her, left an injunction that the more fortunate children and

grandchildren of Joseph Skaggs may find lasting happiness in remembering and obeying—an injunction meaning that they should see to it that the unbending rigor of their father's will should be tempered with equity and mercy. The enforcement of that tender and solemn injunction lies far beyond the jurisdiction and domain of earthly courts, but, peradventure, it is none the less a proper subject of judicial comment and judicial hope. '

The judgment will be affirmed.

All concur, except *Valliant, P. J.,* who is absent.