## MATTHEWS et al. v. FIRST STATE BANK OF RICHLAND. (No. 8713.)

(Court of Civil Appeals of Texas. Dallas. March 24, 1923.)

**1. Landlord and tenant ⟨⇒⟩18(3)—Evidence of relation held sufficient.**

In an action by a bank against vendees of a tenant for conversion of cotton on which the tenant had given the bank a mortgage securing notes, defended on the ground that the money paid for the cotton went to extinguish a landlord's lien for furnishing supplies to the tenant, evidence that one to whom the tenant was indebted for supplies, and to whom his share of the proceeds for the cotton was paid, was the tenant's landlord, *held* sufficient.

**2. Landlord and tenant ⟨⇒⟩1—Delivery of land by owner to control of another to rent held to make the other landlord as to renter.**

If a landowner delivers land into control of another to use as his own and to receive the benefits of its production, and he rents it to a third person, the one to whom the land is delivered would be the landlord, and the third person his tenant.

Appeal from Navarro County Court; A. P. Mays, Judge.

Action by the First State Bank of Richland against J. F. Matthews and others. From judgment for plaintiff against defendants L. C. Burdette and Felix Matthews jointly and severally, the last-named defendants appeal. Former opinion affirming judgment withdrawn, judgment reversed, and cause remanded.

Callicutt & Johnson, of Corsicana, for appellants.

Richard Mays, of Corsicana, for appellee.

HAMILTON, J. [1] This is an appeal from a judgment against appellants, L. E. Burdette and Felix Matthews, jointly and severally. Appellee sued J. F. Matthews, L. E. Burdette, Pursley Gin Company, and Felix Matthews. The suit was based upon three certain promissory notes executed to appellee by J. F. Matthews and secured by mortgages upon all cotton grown upon certain farms in Navarro county during the year 1916, as well as upon other personal property. The liability against appellants, Burdette and Felix Matthews, was predicated upon an allegation of conversion. Under this allegation, separate and distinct liability against them, jointly and severally, for the sum of $201.81 was fixed by the judgment. They alone have appealed.

J. F. Matthews was a tenant farmer in 1916, and on January 19, March 25, and May 9, respectively, of that year, he executed to appellee his certain promissory notes and also executed the different mortgages upon personal property, including cotton to be raised by him during the year, which mortgages, as above stated, were foreclosed by the judgment of the court. It seems that, as the cotton was ginned at Purdon, Tex., it was sold to Felix Matthews, a merchant in that place, and was later sold and delivered by Felix Matthews to appellant Burdette, a cotton buyer at Dawson, Tex.

J. F. Matthews cultivated about 25 acres of land during the year 1916 on what is designated as the Shores farm, and raised on it a little more than five bales of cotton. The rental contract was made between J. F. Matthews and C. A. Kupper. Mr. August Shores, Kupper's father-in-law, in whom the record title to the place was at that time, went to Colorado about the 8th of January, 1916, and returned in June of that year, and while he was gone Kupper had charge of and rented the 25 acres cultivated by J. F. Matthews during 1916, which Shores had "turned over" to Kupper and his wife and another of Shores' daughters. Kupper swore that after Mr. Shores returned in June of that year he made a deed conveying jointly to Kupper and his wife and a sister of Kupper's wife the 25-acre tract of land. Kupper testified

---

⟨⇒⟩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

that the deed was made several months after Shores' return, but the specific date of its execution is not approximated in the testimony.

Kupper rented the farm originally to B. C. Riddle in the latter part of December, 1915. Thereafter, about the 1st of May, 1916, J. F. Matthews came to him and told him that Riddle was going to work a place near Richland which J. F. Matthews was working, and that he (Matthews) would cultivate the 25-acre tract. Kupper testified that he stated to Matthews that he did not care how the latter and Riddle traded just so Matthews took up the indebtedness which Riddle owed him. No specific agreement between him and Matthews beyond this is disclosed in the testimony. At that time Riddle had about 4 acres of the place planted, and Matthews planted and cultivated the balance of it. Matthews made 5 bales of cotton and a remnant. The checks for the purchase of the cotton were drawn by Felix Matthews and made payable to J. F. Matthews or bearer. These checks were cashed, and out of the proceeds one-half, which was the part belonging to the landlord, was taken, and also all the indebtedness incurred by Kupper by reason of charges made against him by Felix Matthews on account of J. F. Matthews was paid to Kupper, as well as that which had been charged to Kupper by Felix Matthews for supplies furnished Riddle before the exchange of places between him and J. F. Matthews.

The contract appearing to be one which constituted J. F. Matthews a "share cropper" or worker on the halves, the title to only one-half of the cotton raised, of course, was in J. F. Matthews. The indebtedness charged against Kupper for supplies to Riddle and Matthews amounted to as much as J. F. Matthews' entire share of the cotton mortgaged by him to the bank to secure the three notes executed by him to it. This being so, the proceeds of all the cotton were thus completely consumed in the payment of rent and accounts charged to Kupper for supplies furnished Riddle and J. F. Matthews.

The indebtedness evidenced by the notes was valid and subsisting at the time the judgment of the trial court was entered. The mortgages executed to secure them were likewise valid, and, having been duly recorded, at least constructive notice of their existence was to be charged to each of the appellants.

A trial was had in the court below before a jury, and at the conclusion of the evidence the court instructed a verdict for appellee.

The first proposition advanced by appellants is that the judgment of the court is erroneous because it appears from the evidence that appellee charged J. F. Matthews usury upon each of the three notes sued upon, and that therefore the judgment is excessive because, usury having been pleaded and proved, appellee could not recover more than the amount of the aggregate principal of the notes. Our attention is called to no evidence which we think is sufficient to disclose that usury was practiced by the bank in the transaction, and, for this reason, we consider the proposition to be without merit.

Various other propositions are presented in a more or less indefinite manner, the substance of all of which may be abridged into the statement that, as the landlord's lien for supplies is superior to all other liens against the crop of a tenant, and since the evidence revealed that Kupper, as landlord, furnished supplies to Riddle and J. F. Matthews, which were paid for out of the proceeds of the cotton in the settlement made by Kupper with Felix Matthews on the Riddle and J. F. Matthews accounts, all of J. F. Matthews' interest in the crop was consumed in the settlement of a debt preferred under the law over that due the bank. And, the money thus having been applied to the extinguishment of a superior lien, neither of the appellants converted any of the property, as all of the purchase price of the cotton was applied only to the payment of an indebtedness secured by a lien superior to that asserted by appellee. If the evidence is such that it conclusively established the facts to be that Kupper did not bear to J. F. Matthews and Riddle the relation of landlord in the transactions by which Kupper furnished them supplies, then, certainly, no landlord's lien could be asserted. On the other hand, if the evidence under any reasonable view is such that it will support the conclusion that the relation of landlord and tenant existed between Kupper and Matthews, as well as between Kupper and Riddle, when the supplies furnished them were obtained and charged to Kupper, it would follow from such conclusion that the landlord's lien existed against the cotton when it was sold, and such lien could have been discharged in only one of two ways, to wit, either by acts of Kupper constituting a waiver of it, or by extinguishment of the debt; and, if the landlord's lien existed when the cotton was sold and the proceeds applied by Kupper to the payment of the debt due Felix Matthews (as Kupper did apply it), then, the application in this manner of the money paid for the cotton being but the satisfaction of the lien, the purchase could not amount to conversion or illegality of any nature to be asserted by appellee. If the landlord's lien existed for an indebtedness equal to the whole of Matthews' interest in the cotton after deducting the expense of picking and ginning (which seems to be established by the record), and the proceeds of the sale were applied solely to the payment of the debt, the title to the cotton passed entirely free from any claim the appellee could assert

by virtue of its mortgage. In such circumstances it would be as if no mortgage ever existed on the cotton in favor of the bank.

Accordingly the question, and the only question for our determination, is this: Did the evidence conclusively fail to reveal that the relation between Kupper, on the one hand, and Matthews and Riddle, on the other, was that of landlord and tenant when the merchandise was furnished the latter and charged to the former under the arrangement with Felix Matthews, the merchant, who also bought the cotton? If so, then the judgment should be affirmed. If not, the question should have been submitted to the jury, and accordingly the judgment cannot stand.

The proof conclusively establishes that the record title to the land was in Shores when Kupper rented it to Riddle and Matthews, and remained in him continuously thereafter until the crop was gathered and sold. During the year 1916, or thereafter, Shores told appellee's cashier, in the presence of another, that he was in fact Matthews' landlord. Shores did not authorize any charge to be made against him. His instructions were precisely the opposite.

The record clearly indicates that no actual title to the land ever passed to Kupper or his wife until after the death of Shores, who died January 25, 1917, leaving a will, which was duly probated, by which he disposed of this particular tract of land. The record is barren of any proof as to who owned and furnished the teams and implements with which the crop was made on the 25-acre tract of land, more or less, during the year 1916.

Kupper, who claimed to be the landlord, among other things testified as follows:

"I am a son-in-law of Mr. August Shores, deceased. I had been married into his family, when he died, about 16 months. He had lived on this place a great many years. He died January 25, 1917. He left on the 8th of January, 1916, to go to Colorado for his health, and returned about the last days of June. He had cancer of the throat, and had lost his speech on account of the cancer in his throat. At that time I was looking after that 25 acres of mine that he turned over to me and my wife and one of the other girls. I had married into his family during the first part of 1916 when he went off for his health. I married in the fall of 1915. While he was gone to Arizona, the old lady looked after the home place. He made a deed to that 25 acres to us; he give it to us. That was a good while after I married, after he came back from Arizona; don't know how long after he came back when he made us that deed. Outside of this 25 acres, I was not looking after or attending to his business, none of it. This man Riddle rented that 25 acres from me; he didn't rent any more than that; well, it may run up to 28 acres, including that little patch of corn he had. Mr. Shores deeded that 25 acres to me after he came back from Arizona in June of that year, 1916. I couldn't say what time of the year made me the deed

to this 25 acres. He gave us 12½ acres, and the other 12½ I bought, one of the girl's part. I don't know what time of the year it was that he deeded this 25 acres to me and the girl. It was several months after he came back. I don't remember who wrote the deed. The deed was made to my wife, who was Opal Shores. The other girl, my wife's sister, was named Kate. She was 21 years old. He didn't make any separate deed. There was just one deed. There were two more children he had. I made the rent contract with Riddle. I didn't make it for Mr. Shores. He had turned it over to us then, but he had not made any deed to the land, but he had turned it over to my wife and the three girls. He intended me to look after it and take care of it while he was gone. He didn't sign any papers or give me any written papers. Mr. Shores didn't talk to me and Mr. Matthews about furnishing Riddle. Mr. Shores didn't have a thing in the world to do with that. Mr. Shores was not there when I was talking to Felix Matthews about it; he was in Arizona then. I rented the place to Riddle on Christmas Eve day. * * * Neither I, my wife, or my sister-in-law had any papers of record anywhere showing our title or right to the 25 acres of land that was being worked by Riddle. I didn't know J. F. Matthews, the man that succeeded Riddle, until he come up in the field where I was; I never did see him before. I don't know what kind of a trade they made. I told Matthews if he took up Riddle's indebtedness it didn't make any difference to me what he and Riddle did. I reckon that trade was along about the 1st of May. Shores was then in Arizona. * * * Riddle didn't have anything planted, only about 4 acres, and Matthews planted the balance when he came over there and took charge of it. Matthews had about 25 acres of cotton and about 3 acres of corn. That year he made five bales of cotton and remnant. That was all he made. * * * The five bales of cotton was sold at Purdon. The remnant of a bale was sold at the gin of the Pursley Gin Company. I got a check for my half interest in that, payable to me individually, as well as I remember. I don't remember whether it was payable to August Shores or not. I think it was made payable to me. Mr. Shores carried this remnant to the gin and brought the check to me. He hauled the remnant to the gin and then brought the check to me. * * * The proceeds of the sale of the five bales of cotton was all paid to me for rent and for advances and supplies furnished by me to Riddle and Matthews. * * * This man Matthews rented on the halves. I was the landlord. Mr. Shores had turned this land over to me before he went off, and I made the rental contract for the land first with Riddle. I was acting for myself and the three girls. I got the rents; they were paid to me. The money I got for the rent came to me and these three girls. Mr. Shores did not get any of that rent. By the halves was meant that Matthews was to furnish all the labor. This cotton picking came out of his half of the crop."

This testimony, we have concluded, is sufficient to raise the issue of whether or not Kupper was in fact the landlord. If he was, he of course had the landlord's lien on J. F.

Matthews' one-half of the crop for the advances and supplies furnished in the manner and in the amount which both he' and Felix Matthews testified he did furnish.

[2] If Shores delivered the tract of land into the control and possession of Kupper for the year 1916 to use as his own and receive the benefits of its production, and with such possession and control Kupper rented it to Matthews on the halves, then such facts would constitute Kupper the landlord and Matthews his tenant, notwithstanding that ownership of the land continued in Shores.

Accordingly we are of the opinion that the trial court erred in failing to submit to the jury under the proof the question of whether or not Kupper was the landlord, instead of peremptorily instructing the jury to return a verdict for appellee.

The opinion of this court heretofore delivered affirming the judgment of the trial court is withdrawn, and the judgment is reversed, and the cause remanded.

