MAMIE DENNY, MARIE KENDRICKS and RUBY MYERS, RESPONDENTS, v. HARRY HICKS, POLLY ANN ALLISON, BERNICE HICKS AND RAY ALLISON, APPELLANTS.*

Springfield Court of Appeals. January 20, 1928.

*Corpus Juris-Cyc References: Wills, 40Cyc, p. 1004, n. 3; p. 1147, n. 64; p. 1151, n. 94; p. 1155, n. 81; p. 1164, n. 78; p. 1169; n. 15; p. 1330, n 26; p. 1831, n. 41, 42; p. 1332, n. 46.

*W. R. Adams* and *G. Purd Hays* for appellants.

*Lz Banta* and *C. H. Jackson* for respondents.

BRADLEY, J.—This cause is a will contest. Plaintiffs prevailed and defendants appealed.

The parties, plaintiff and defendant, are the grandchildren and great grandchildren of Mrs. A. E. J. Allison, deceased. November 5, 1924, Mrs. Allison made a will by which she willed to defendant Harry Hicks, a grandson, one-half of her property and to Bernice Hicks, a small daughter of Harry Hicks, one-fourth of her property, and to Ray Allison, a great grandson, one-fourth. To the other parties to this cause testatrix willed the sum of one dollar. Testatrix died January 16, 1926, leaving a personal estate of $2250. The real property if any is not shown in the record. This cause was filed March 10, 1926.

Mental incapacity of testatrix and undue influence, alleged to have been exercised upon her by defendant Harry Hicks are relied upon by those contesting the will. The proponents of the will, the defendants, at the outset of the trial, which was to a jury, followed the usual procedure and introduced evidence sufficient to establish a prima-facie case for the validity of the will. Thereupon plaintiffs, the contestants, introduced their evidence in the endeavor to establish mental incapacity and undue influence. Such is the usual and correct procedure. [Lindsay et al. v. Shaner et al., 291 Mo. 297, 256 S. W. 319.] It is contended by the proponents of the will that there was no substantial evidence adduced by the contestants tending to establish that testatrix was not mentally capable when she executed the will or that she was moved to its execution by any undue influence of defendant Harry Hicks. In considering the assignments we shall refer to the contestants as plaintiffs and to the proponents as defendants.

Testatrix was about eighty years old when the will was executed. She was a widow and since her husband's death, sixteen years prior to her death, she lived alone upon a farm. She could neither read nor write. The evidence of plaintiffs on the grounds alleged is substantially as follows: E. C. Platt testified that he was acquainted with testatrix; that he knew her for several years; that he lived on a place adjoining the place of testatrix; that their houses were about a quarter of a mile apart; that he saw her every day for four years; that he did not consider her capable of transacting her financial affairs.

John Bragg, a former prosecuting attorney of Douglas county, testified that he was acquainted with testatrix for many years and that he transacted some business for her relative to some checks upon which her name was alleged to have been forged; that he first talked to her about the matter in August, 1922; that at that time she did not know how much money she had or what the extent of her property was; that she was not then competent, is his judgment, to transact her own business; that a committee of the neighbors of testatrix came to see him about the forged checks and insisted that he go out to the home of testatrix; that he went and that at that time testatrix made no formal complaint against the person alleged to have forged the checks; that she wanted to wait and talk to Harry Hicks about it; that later testatrix, Harry Hicks and Mrs. Denny came to his office and that Harry gave to him the necessary information regarding the forged checks and that he then prepared a complaint and that testatrix signed it; that on this occasion he advised Harry that someone should look after the affairs of testatrix and that Harry said that "he had come to that conclusion and he would see that that was done." At the time the complaint was drawn in Mr. Bragg's office testatrix had her money in a bank in Ava, in Douglass county. Witness Bragg testified that later Harry told him that "we" have taken the money to Seymour.

Testatrix, so the record shows, had made two or three wills prior to the one now in question and in these, so far as it appears, she had distributed her bounty more equally among her grandchildren and great grandchildren than she did in the last will. George Fox testified that sometime in 1924 he heard a conversation at testatrix's place, "in her presence, by the defendant here (Harry Hicks) in which he said if she hadn't changed her will it was time she was at it and to make it solid. He said if talking would do any good he would see that Mrs. Denny (plaintiff Mamie Denny) would never get any part of the estate. He said if Mrs. Denny would ever apologize he might give her part of it to her."

Plaintiff Mamie Denny testified to the effect, based on her observation and contact, that testatrix could not look after her own busi-

ness; that "she was incompetent of doing that;" that she saw her grandmother in October and November, 1924 and talked with her and that she was not then capable of transacting her own business; that testatrix did not then know what her property consisted of; that she was then, in her judgment of unsound mind; that she, testatrix, did not remember very well; that she did not believe that her grandmother knew all of her relatives. "In this will she says, 'To my grandson Ray Allison;' Ray Allison is her great grandson."

After the incident of the forged checks the record shows that testatrix moved her bank account from Ava to Seymour and authorized the bank at Seymour to honor checks on her account signed by defendant Harry Hicks; that thereafter Harry Hicks signed her name to checks paying her bills; that on September 23, 1922, testatrix directed the bank at Seymour to honor Harry's checks on her account for $525; that this was done and with the money Harry bought an automobile for himself; that later testatrix permitted Harry to check on her account for an amount sufficient to pay the difference between the automobile first purchased and another new one. It is also shown that after Harry purchased the automobile he took his grandmother wherever she wanted to go, and assisted her in transacting her business affairs. On the day the will was executed Harry took testatrix from her home to the office of Charles H. White, cashier of the Bank of Seymour and Mr. White drew the will. Raphael Goss, on this occasion, accompanied testatrix and Harry to Seymour and sat in the rear seat of the car. He testified that on the way he heard "a will" mentioned between Harry and his grandmother, but did not remember just what was said. This witness further testified:

"When we got to town, we went to the bank where Charlie White works. Harry said something to Charlie, and they went in that room and I heard Charlie asking his grandmother her age and how old she was. I was back in that other room a few minutes. Harry was in the room at the time, and Mrs. Allison and Charlie White."

By the will in question testatrix named Harry Hicks as executor and requested that he be permitted to serve without bond. It also appears from the record that Harry Hicks at the time the will was executed had considerable property and that in addition to his property he had a substantial income from the government, and that Mamie Denny, his sister, had no property of consequence, but her husband owned a farm consisting of 110 acres and worth about $4000.

In addition to the prima-facie showing made by defendants at the outset defendants offered other evidence tending to show that testatrix was of sound mind and capable of transacting her business at the time the will was executed and at all other times prior. And that she was not influenced in the making of the will by Harry Hicks. Harry Hicks denied attempting to influence his grandmother in mak-

ing her will. He admitted that he took her to Seymour the day the will was executed, but testified that he did not talk to her about the will. "I did not know she was going to make a will. She had a pension check. I was not there at the bank that day at all. I did not know she made a will that day. She never mentioned it, either up there or on the road . . . I never at any time told her she ought to make a will the way this one was made. I did not exercise any undue influence over her in the making of the will or anything else. She had a head of her own and I nor no one else could persuade her; I did not make the statement that Mrs. Denny says I did, that is if Mrs. Denny didn't do so and so, I would see that she got nothing. I never told anyone else that. I had no such conversation with grandmother about a will and Mrs. Denny's part of the estate as has been testified to here by George Fox. I had no conversation with grandmother about a will as has been testified to here by Raphael Goss. She never talked to me about making a will."

Charles H. White, who drew the will and who was one of the witnesses to it testified that he was cashier of the Bank of Seymour; that he knew testatrix three or four years prior to her death; that testatrix had business transactions at his bank. He identified the will and stated that he drew it at the request of testatrix; that she gave him "the terms of the will herself and I wrote it down just as she told me;" that testatrix told him that she wanted to change her will; that he did not ask her about another will; that he did what testatrix told him to do; that testatrix left the will he drew there in the bank; that he did not remember that Harry Hicks was present when the will was drawn; that from the conversations and business transactions he had had with testatrix she, in his opinion, was of sound mind.

N. E. Julien, who was a witness to the will, testified that he had a real estate office in the bank where the will was drawn; that he came in while the will was being written and that "she went ahead and dictated it and Charley wrote the will;" that Harry Hicks was not there; that he had no prior acquaintance with testatrix.

"Q. What would you say, give your best judgment, as to what you saw there of her actions and what you heard her say and what she directed Mr. White to do in regard to making this will, whether she was of sound mind? A. I didn't see anything to the contrary; it seemed like she was as sane as any of the rest of us in the bunch."

Alfred Pyatt testified that he was cashier of the Peoples Bank of Seymour; that he was acquainted with testatrix in her lifetime; that he first met her in January, 1925; that she had a checking account at his bank; that she came to the bank about once each month.

"Q. Mr. Pyatt, from the conversations you had with her and her demeanor and business transactions there at your bank, what, in your

judgment, was the condition of her mind? Was she sound in mind and able to transact her business and dispose of her property by will? A. Yes, sir, she was, in my opinion.''

J. W. Reece testified that he was president of the Citizens Bank of Ava; that he knew testatrix for thirty years; that he had had business transactions with her.

''After we came here we had some money in the bank that belonged to her through some other transactions and I really didn't know it was her money until after she had transferred it, and she came down there and she didn't know I was there, and came in the bank and called me Jimmy, and I cashed several of her checks after that time at different times she was here. She went up to the house and eat dinner with us. I would consider that she was of sound mind and competent to make a will. She seemed very careful about taking care of her business.''

Alonzo King testified that he knew testatrix for something like twenty years; that he lived in one-half mile of her and saw her frequently.

''For ten or twelve years she bought practically all the milk, cream and butter she used, and all she used for the last six or seven years of me. I sold her produce for her and got her wood for the last four years, and for the last two years I husked what little corn she had left and sold it for her. I made posts and remodeled her fence around her garden and yard. She had me to do this work and paid me for it herself. When I sold her a half bushel of potatoes, did a little job of work or haul her some wood, she would ask me what she owed me, get the change, count the money, whatever I said it was, and hand it to me herself. I knew her up to the time of her death. I knew her in November, 1924, when it is alleged she made her last will. I saw her every week for the last four or five years. As long as she was able she came to my place for milk and cream. She seemed to me like her mind was all right in November, 1924, and her memory was fairly good, for a person of her age. I think she knew what property she owned, knew and remembered her grandchildren, and by her talk to me and my folks, I think she knew what disposition to make of her property and who she gave it to without the aid of anybody else. She transacted her general business and everyday affairs herself, and if Harry Hicks managed any of her affairs, I don't know of it. Of course he would take her to town whenever she wanted to go and all such as that, and as to anybody influencing her, she seemed to have a mind of her own.''

Mrs. Ella King testified: ''I knew Grandma Allison for about twenty years. I lived a neighbor to her. She visited our place often, and got milk and cream at our house, and I visited her lots of times. I knew her in November, 1924, and from my acquaintance with her

and her business transactions with us, I am of the opinion that she had a sound mind and good memory. I was there during her last illness, and she seemed to know everything up until toward the last.''

Alonzo King further testified: ''Q. I will ask you if you knew about grandma buying a car for Harry in 1922? A. Grandma said that she bought a car and give it to Harry so that she would have some way of going when she wanted to.'' This witness was asked if he had heard testatrix say anything about a rumor that plaintiff Mamie Denny and ''her folks'' were supposed to have started about having a guardian appointed for testatrix after she bought the automobile for Harry Hicks, and he answered:

''Well, she said she had heard some of them were talking about trying to have a guardian appointed for her, and she said that was her money and she thought she ought to have a right to do as she pleased with it. . . . I heard her talk more than once about this rumor. This conversation was after the first car was bought. She said they were cutting up so, when they got the new cars out and there was a nicer one than the one she first got she would get one of them. She always called the defendant Mrs. Denny, Mamie, in talking. She said that if Mamie and the rest of them thought she was crazy and appointed a guardian for her that all the law would allow Mamie was all she would get.''

Mrs. Stella Barnham testified: ''I live down at Granada; have lived there a little over a year. I knew Mrs. Allison all the time I lived there. She visited our place frequently. I was there quite a few times during her last illness and was there the night she died. From my acquaintance with her and conversations with her, I am of the opinion that she had an awful good mind for an old lady of her age. She told me about Mr. Rineheart's trial, cooking, things that happened quite a few years ago, and talked about farms and neighbors.''

Dr. E. G. Beers testified that he knew testatrix about a year; that he treated her ''about a year ago;'' that Harry Hicks brought her to his office when he first treated her.

''I treated her during her last illness, and made five visits there then. In her dealings with me, she seemed to be of sound mind and good memory and competent to make a will. Her general bearing and everything indicated that she was a woman of ability to look after her own business. She wanted to pay her bills and not have anything owing. I first visited her on January 6th this year, in her last illness, and visited her on the 7th, 8th, 9th, 10th and 11th. Harry came after me. She lived at Granada, about twelve or fourteen miles from Seymour. Her mind was clear and she wanted Harry to pay me and said she didn't want any bills hanging over. I don't know whether she could write her checks or not. She was

telling him what to do. He consulted her about the charges before he paid me."

Mrs. Lucy Cheatham testified: "I live at Granada. I knew Grandma Allison. She was at my place three times and I saw her at Mrs. Cornelison's a time or two. I knew her right close to six months, and I helped wait on her during her last illness, and was there about three quarters of an hour before she died. From my acquaintance with her and the conversations I had with her she was in my opinion as sound minded a person as I ever saw of her age; she was solid minded. I couldn't tell any difference during her illness. It seemed she had as bright a mind as anyone until the time I left there, about three-quarters of an hour before her death."

In Bushman et al. v. Barlow et al., 292 S. W. (Mo. Sup.) 1039, the law relative to the character of evidence to support the charge of undue influence by a near relative is considered at length. There it appears that a daughter was charged in a will contest with unduly influencing her mother in the making of her will. In that case as here there was no direct evidence that the daughter had attempted to influence her mother as to her will. Circumstances as here were relied upon. There it appears that the daughter assumed the management and control of her mother's household; that she paid the bills; deposited her mother's money to her mother's credit; consulted with and advised her brothers and a cousin when either was attending to her mother's affairs; that she had authority to sign her mother's name to checks; that she left the accounting and adjustment of her and her mother's transactions to the banks or brokers with whom they did business; that she was consulted by her mother rather than either of her brothers when the mother sought counsel concerning her affairs; that there were conversations between her and her mother in the presence of others in which the mother's will was referred to, but there were no conversations concerning the manner in which the will was to be made or who were to be the objects of the mother's bounty; that long prior the daughter had received a deed from the mother to real estate the mother had inherited; that the daughter was named executrix of her mother's will. It was held that there was no prima-facie showing of undue influence.

In the Bushman case, however, the testatrix did not make an unequal distribution of her estate among those who had equal natural rights of expectancy. The contest there came about because of the manner of preservation provided in the will. In the cause at bar there was an unequal distribution among those who had equal natural rights of expectancy.

In an action to contest a will on the ground of undue influence a wide latitude in the admission of evidence is permitted, but a limitation upon this rule is that evidence; direct or circumstantial; to

establish undue influence must be of such a nature and character as to amount to overpersuasion, coercion or force, to the extent of destroying the free agency or will power of the testator. The proof of influence resulting from affection or attachment or the desire of gratifying the wishes of one beloved, respected or trusted, does not constitute undue influence and will not sustain that charge. [Bushman v. Barlow, 292 S. W. l. c. 1050 and cases there cited.] Opportunity alone, however ample does not afford a basis from which undue influence may be inferred. [Lindsay v. Shaner, 291 Mo. 297, 236 S. W. 319.] But it is contended by plaintiffs, contestants, that the facts disclosed show that a fiduciary or confidential relation existed between Harry Hicks and testatrix and that such being the case undue influence will be presumed. In support of this contention plaintiffs cite Weighmann v. Weighmann, 261 S. W. (Mo. App.) 758 and other similar cases. It was held in the Weighmann case that there was some substantial evidence tending to show undue influence, but the facts of the case are much stronger than are the facts of the cause here.

In Bushman v. Barlow, supra, the court speaking through Judge WALKER uses this language:

"The feelings of a father towards his children, whether of partiality or prejudice, not engendered by fraud, deceit, mental incapacity, or such an influence as to subdue his mind and destroy his free agency, is not sufficient to set aside a will of his property, although it be shown that the making of same was moved by the feelings referred to; and the force of the rule is not lessened by the fact that such feelings may have been unjustly harbored. [Hayes v. Hayes, 242 Mo. l. c. 169, 145 S. W. 1155; Winn v. Grier, 217 Mo. l. c. 459, 117 S. W. 48; Dausman v. Rankin, 189 Mo. l. c. 503, 88 S. W. 696, 107 Am. St. Rep. 391; Schierbaum v. Schemme, 157 Mo. 1, 57 S. W. 526, 80 Am. St. Rep. 604.] This rule of construction arises out of the more general one that the absolute ownership of property carries with it the right of arbitrary disposition of the same according to the untrammeled volition of the owner. By untrammeled volition in the alienation of property, we mean a voluntary act of the grantor or devisor possessing that mental capacity necessary to the validity of the act, and in the absence of fraud, deceit, or such an influence as to overcome or unduly direct the free agency of the grantor or devisor."

In Turner v. Anderson, 236 Mo. 523, l. c. 541, 139 S. W. 184, the court said:

"Undue influence to be effective in breaking a will should be of sufficient potency to destroy the free agency of testator at the time of making the will. The influence of natural affection is not sufficient; for natural affection may flow at all times and its waters are under

no ban known to the law. The undue influence that will break a will must be present, in active exercise and rise to the mark of such overpersuasion, coercion, force, fraud, or deception, as breaks the will power of testator and puts in its stead the will of another. [Teckenbrock v. McLaughlin, 209 Mo. 1. c. 551, 108 S. W. 46, and cases cited; Fulton v. Freeland, 219 Mo. 494, 118 S. W. 12, 131 Am. St. Rep. 576.] We have time and again taken occasion to say that the only object of the statute on wills is to permit ·the owner of property to take it out of the Statute of Descents and Distribution, and to dispose of it unequally by his domestic decree, in which decree he sits as a chancellor on the equities of his heirs and his own domestic affairs. An unnatural will cannot be broken merely because unnatural. Its harshness and unnatural features only operate when coupled with present facts tending to show undue influence when that is the issue, or testamentary incapacity when that is the issue. A testator when writing his will need not write it as a supplication to a jury, viz.: 'I wish my property to go so and so, and hope that a jury will upon the· subject think the same as I do, and confirm my act.' [Lynch v. Doran, 95 Mich. 1. c. 409; Conner v. Skaggs, 213 Mo. 1. c. 349, 111 S. W. 1132; Meier v. Buchter, 197 Mo. 1. c. 86 et seq., (94 S. W. 883, 6 L. R. A. (N. S.) 202, 7 Ann. Cas. 887.]"

If it be conceded that the relation between testatrix and Harry Hicks was fiduciary or confidential and that such gave rise to the presumption of undue influence, the presumption disappeared in the light of the affirmative and uncontradicted evidence of defendants that Harry Hicks did not exert or attempt to exert any undue or other influence upon his grandmother in the making of her will. [Bushman v. Barlow, supra.] When the presumption was destroyed plaintiffs had nothing left to support the charge of undue influence. Harry Hicks may have unduly influenced testatrix to favor him to the detriment of others equally deserving, but under this record and the law as we find it we are constrained to hold that plaintiffs failed to sustain the charge of undue influence.

The rule of testamentary capacity is ·that the testator must have sufficient mind and memory to intelligently understand the nature of the business in which he is engaged; to comprehend generally the nature and extent of the property which constitutes his estate; and to recollect the objects of his bounty. [40 Cyc. 1004; Crum v. Crum, 231 Mo. 636, 132 S. W. 1070; Lindsey v. Stephenam, 229 Mo. 600, 129 S. W. 641; Mowry v. Norman, 223 Mo. 463, 122 S. W. 724.] It is not necessary, however, that he have a perfect and complete understanding and appreciation of these matters in all their bearings. [Couch v. Gentry, 113, Mo. 248, 20 S. W. 890.]

A will contest stands like any other law case and if there is any substantial evidence to support the grounds upon which the contest is based the issue is for the jury. [Freman v. Lowenstein, 303 Mo. 339, 250 S. W. 460.] We cannot say from this record that there was no substantial evidence tending to show mental incapacity hence we hold that it was proper to submit this issue to the jury.

Plaintiffs complain of the admission of evidence. We find no substantial grounds to support this assignment, and since the cause is to be retried such complaints as are made on the admission of evidence may be obviated. Unless there is more evidence than appears in this record the court will not again submit the issue of undue influence.

For the reason that the learned trial court submitted the issue of undue influence without substantial evidence to support such issue, the judgment should be reversed and the cause remanded, and it is so ordered. *Cox, P. J.,* and *Bailey, J.,* concur.