FRANK P. VANAUSDOL, ADMINISTRATOR OF ESTATE OF ADDISON VANAUSDOL, DECEASED, RESPONDENT, v. BANK OF ODESSA, APPELLANT.*

Kansas City Court of Appeals.   January 3, 1928.

*Corpus Juris-Cyc. References: Appeal and Error, 3CJ, section 736, p. 825, n. 53; 4CJ, section 1727, p. 118, n. 99; section 2833, p. 849, n. 38, 42; section 2834, p. 853, n. 63; section 2840, p. 865, n. 48; section 2995, p. 1012, n. 16; Banks and Banking, 7CJ, section 376, p. 669, n. 39; Evidence, 22CJ, section 50, p. 109, n. 18; section 303, p. 285, n. 4; section 380, p. 337, n. 58; p. 338, n. 72; section 880, p. 780, n. 69, 70; section 1121, p. 919, n. 73; 23CJ, section 1755, p. 20, n. 45; Forgery, 26CJ, section 135, p. 970, n. 42; Pleading, 31Cyc, p. 91, n. 77; p. 414, n. 13; Trial, 38Cyc, p. 1518, n. 69; p. 1707, n. 98; p. 1755, n. 63; Witnesses, 40Cyc, p. 2744, n. 60; p. 2766, n. 23.

*Aull & Aull* for respondent.

*Blackwell & Sherman* and *Lyons & Ristine* for appellant.

BLAND, J.—This is an action to recover the sum of $1500, which defendant refused to pay Addison Vanausdol, deceased, one of its depositors. The action is founded upon the allegation that the defendant cashed a forged check in that sum, purporting to have been

signed by the said Vanausdol, and refused upon notification of the forgery to credit his account with said sum. There was a verdict and judgment in favor of plaintiff and defendant has appealed.

The case was instituted by Addison Vanausdol who died on October 9, 1923, during its pendency and was revived in the name of his son, Frank P. Vanausdol, administrator of his estate.

The facts show that Addison Vanausdol was ninety-five years of age at the time of his death and during the time that the facts in controversy transpired he was feeble. For more than thirty-five years he had been a depositor and customer of defendant bank but his account had not been a particularly active one; his checks averaged two or three per month. At the time of the payment of the fifteen hundred dollar check in question and for more than three years prior thereto his daily balance averaged about $2750. His deposits were sent to the bank usually by mail and most of the checks drawn against his account reached the defendant through the mail, having been cashed at other banks. Nearly all of the checks that he drew upon his account up to the cashing of the disputed check in question were for amounts up to $56, the amounts over that sum being evidenced by a check of May 17, 1918, in the sum of $500, one of October 10, in the same year, in the sum of $194, one of November 5, 1920, in the sum of $400 and one on February 7, 1921, in the sum of $216. The $1500 check in controversy (Exhibit 802) was dated December 12, 1921, made payable to Mrs. Josie A. Smith, cashed by defendant on June 14, 1921, and had upon it the notation, ''For care.''

For many years deceased lived upon an eighty acre farm near Chapel Hill in Lafayette county. He had two sons and one daughter; one son living in another part of the country and the other son and daughter, both married, living with their families nearby. In March, 1918, Mrs. Josie A. Smith and her husband moved upon the farm of deceased; they lived in a house separate from the one he occupied until the year 1920. There was a written lease to Smith of a part of the premises, executed in 1918 and another one signed by the deceased and by Mrs. Smith in the name of her husband in 1920. In 1920 Mrs. Smith and her husband moved into the dwelling occupied by the old gentleman, the latter retaining one room. Mrs. Smith boarded deceased and took care of his room and waited upon him from the time she moved upon the place. About the first of each month deceased gave to Mrs. Smith a check for $15. Beginning with a check dated December 2, 1919, these checks had written upon them ''For board and care as heretofore'' with the exception that the checks of December 2, 1919, and January and February, 1920, had on them ''For board and care as heretofore since March 2, 1918.'' The checks given to Mrs. Smith prior to December 2, 1919, had no notation upon them.

Mrs. Smith testified that the $1500 check in question was given to her for care and that the other $15 checks were for board. She, how-

ever, testified to the effect that she accepted these latter checks with the notation upon them without giving any explanation for so accepting them. About the first of September, 1921, deceased gave to Mrs. Smith a check (Exhibit 760) in the sum of $15, dated December 2, 1921, having the usual notation thereon, to-wit, "for board and care as heretofore." It is claimed by plaintiff that the $1500 check in controversy, dated December 2, 1921, and cashed by defendant on June 14, 1922, was never signed by Vanausdol and no part of the same was written by him but that it was a tracing of the check dated December 2, 1921.

The evidence shows that the $1500 check was cashed by Mrs. Smith at her bank in Bates City, which forwarded the check to its correspondent bank in St. Louis, which, in turn, forwarded it by mail to defendant bank and it was cashed by defendant on June 14, 1922. In addition to the disputed check plaintiff introduced in evidence sixty-eight checks containing the genuine signature of deceased, which included all checks drawn by deceased upon defendant bank during the year 1921 and up to and including the date of the disputed check for $1500. Plaintiff also offered in evidence the testimony of J. C. Shearman and Judge EWING COCKRELL, expert witnesses on handwriting, who had made a thorough examination before the trial of the disputed document and the other checks introduced by plaintiff, and gave it as their opinion that the signature upon the disputed check was not written by the same person who wrote the signature on the other checks, assigning reasons for their opinion.

Defendant offered in evidence the testimony of eleven bank officials, some of whom were familiar with the handwriting and signature of Addison Vanausdol and others who were not. These witnesses testified that the signature on the disputed check was in their opinion the signature of deceased, and gave it as their opinion that the signature on the disputed check and the other checks in evidence were written by one and the same person.

Defendant put upon the stand Mrs. Josie A. Smith who testified that she and her husband lived upon the Vanausdol farm; that they had some children but these lived elsewhere. Over the objection of plaintiff she testified that the consideration for the disputed check was given for care of deceased. She testified that he was feeble in health and was troubled with dysentery and constipation; that he had to use a bucket when his bowels moved and that she had to help him at those times and assisted him in the use of a syringe when he was constipated; that she had to wash him when he could not answer the call of nature in time; that the nature of her work was very unpleasant; that she was required to put jugs of hot water and heated bricks at his feet when he was in bed and carried his meals to him when he was confined to his bed; that he paid her the $1500 "for these extra things I would do for him outside of boarding" him. She testified that deceased was "feeble at different times . . . he never

was very sick, did not have a doctor." She further testified that Mr. Vanausdol's daughter did most of his washing but that she did the "worst part" of it; that the witness procured certain cancelled checks of deceased from the waste box after he left the farm on October 5, 1922, and preserved them because she wanted to compare the signatures with the one on the disputed check; that it was given to her by deceased but she did not see him write it; that she did not deposit the disputed check in the bank in Bates City where she did her banking business until in June, 1922, because she did not need the money.

On cross-examination she testified that the first contract for the leasing of the premises was in 1918 and the second one in 1920; that there was but one copy of the second contract and she kept that; that deceased had the second contract in his room from February to May, 1922, and when it came out "it was tore." Plaintiff introduced in evidence the written lease between Addison Vanausdol and Smith, leasing the farm from the first of March, 1920, to the first of March, 1923, which shows that a part of the lease had been torn out. Immediately after the part torn out appears the following, "may wish in addition to which the Lessor promises to pay fifteen dollars monthly in advance as long as he may remain at home." Mrs. Smith testified that the $15 referred to in the lease after it was torn, was the $15 for board each month that she received from deceased. She then testified that the part that was gone from the lease was that "I didn't furnish the fruit, he was to substitute any fruit he wishes." She denied that she tore the missing part out of the contract. A deposition taken in another suit between other parties was then introduced in evidence by plaintiff in which she stated—"The part that is gone is that he was to get his board for fifteen dollars per month and if he wanted to substitute anything to eat in addition to what I furnished, he had the privilege."

In the deposition she also testified as follows—

"Q. Did you tear that contract before or after he said this? A. I never tore no contract.

"Q. Isn't some of the contract gone? A. There is not much of it gone, only a line or so. It just got torn, I did not tear it. I had it in the drawer and *when I pulled it out it got torn*.

"Q. Did you ever find the missing lines? A. No, sir.

"Q. How long has it been torn? A. We never took it out for several years. It is old and just laid there.

"Q. When did you first notice it was torn? A. I don't remember how long it was torn. It laid in the drawer several years and when I took it out it was torn." (Italics ours.)

It seems that the bank balanced deceased's account and sent him his cancelled checks only when requested by him. His account was balanced on February 8, 1921 and on August 7, 1921, and each time his checks were returned to him through the mail. Mrs. Smith testified that her son took the checks, which were returned on August 7th and

which included the $1500 check in question, out of the mail box and handed them to her but that she did not return to the house with them because she was on her way to Kansas City and wanted to save a trip back to the house. So she took the checks to Kansas City with her and they got lost in some of her purchases there, "I think it was a hat that I bought;" that she found them in a few days and turned them over to deceased. She testified that Mrs. Wilkerson, deceased's daughter, was the first one to raise any question about the disputed check; that deceased talked to her about it and that he stated— "Nothing more than he showed me the check and told me that the children was displeased with it that he give me that much; he said that they said he gave me too much."

She stated that deceased at no time denied that he gave her the check.

Defendant's witness, Katherine Kelly, testified that she was a daughter of Mrs. Smith and that she talked with deceased; that— "Well, I had a talk with him a number of times and he always said he would pay her (Mrs. Smith) and pay her well, and he said she took the very best care of him and he said the younger ones of people —nobody else didn't take any interest in an old man, and he said that she did, and she took an interest in his affairs and was good to him and waited on him."

The witness further testified that in the latter part of August or first part of September, 1922, she heard a conversation between Mrs. Wilkerson and her father, that—". . . she said to him that he would have to deny his signature, and he said, 'I can't do that because it isn't right.' And then I heard another conversation another time, that was out in the yard, between mother and Mrs. Laura Wilkinson, and Mrs. Wilkinson said to mother, said 'Let's get together and figure this up'; she said 'it may come to fifteen hundred dollars and it may come to eighteen hundred, and if it was less than eighteen hundred would she return what was coming to Mr. Vanausdol, and if there was anything coming to her there wasn't anything said about it at all.' "

Defendant's witness, W. H. Wiley, testified that he was a brother of Mrs. Smith; that he met deceased but one time, the first part of October, 1921, when he was visiting the Vanausdol house; that at that time deceased told him—". . . that my sister took better care of him than anyone he had ever had there, and he went on to say that he paid her $25 or $15 a month for board, but, he says, these extras, this extra care I expect to pay her well for; said she had many disagreeable things to do for him and he was going to see that she was paid for it."

Defendant's witness, Taylor, testified that he was cashier of defendant bank and had been connected with the bank for thirty or thirty-five years; that he knew deceased during the latter's lifetime;

that he cashed the disputed check on the day it was received and remitted the proceeds to the St. Louis bank; that the signature to the check was that of deceased and he accepted it as such when the check came into the bank; that the bank kept a copy of the $1500 check because—". . . it was an unusual amount and we were afraid that the checks might get lost in the mail and wanted to know positively who the check was payable to." That the first time he learned there was any question concerning the disputed check, was the last of August or first of September, 1922, when he received such information from Mr. Calfee, president of the bank that a week or ten days later he received a letter from deceased asking him to come to deceased's house. The answer that the witness wrote to this letter reads—

"I looked over the signatures of this and other checks when I was up there and *the signature of the check appears to be genuine* and Mrs. Smith insists that you wrote it and gave it to her." (Italics ours.)

The witness further testified that he went to see deceased and there found the latter, his son, Fred Vanausdol, and his daughter, Mrs. Wilkerson, and her husband; that all but deceased were in the yard under a tree when he arrived; that deceased first claimed—

". . . that the check must have been raised, that he hadn't given the check for fifteen hundred dollars, wouldn't have occasion to pay Mrs. Smith that much money.

"Q. Then what further? A. Well we took the check and examined it closely and I told him that I could see no evidence of any erasure on the check and it evidently hadn't been raised. . . . Mr. Vanausdol then called—when we saw there was no erasure, he then called attention to his signature and he said 'I always put some little dots and marks on my signature and these don't appear on the check.' "

The witness then produced some other checks that he had with him at the time and called deceased's attention to the fact that on another check there were no dots or marks. The witness further testified that he went back a second time about a week or ten days later to see deceased and at that time the conversation was about the same as it was when he made his first visit "except he (deceased) made a proposition to Mrs. Smith to pay back $500, we pay him $500 and the bank at Bates City pay him $500."

On cross-examination, in reference to the first visit, he stated that at first deceased—". . . said the check had been raised; he never gave Mrs. Smith—wouldn't have any occasion to—what he said. He didn't say he didn't give it to her, he said he wouldn't have any occasion to give her a check for fifteen hundred dollars."

The witness's deposition was then introduced in evidence in which he stated that Fred Vanausdol and Mr. and Mrs. Wilkerson claimed, when he visited deceased's place, that the check had been raised from

$15 to $1500 and that deceased himself was not present; that afterwards deceased came out of the house and—

". . . made the statement that he had not given a check to Mrs. Smith for fifteen hundred dollars, had no occasion to do so, that he paid for his board and care with a check each month, and stated on the check 'For board and care.' He afterward called my attention to the fact that some small dots which he was in the habit of putting under his signature were absent, and that he always put those dots under his signature. I picked a check given just a short while before that to W. S. Hampton and called his attention to the fact that he had failed to put dots under that signature.

"Q. There was nothing further said between you concerning the check at this time, that you recall? A. I do not recall anything."

Defendant's witness, Calfee, testified that he was president of defendant bank and was acquainted with the signature of deceased and that in his opinion the signature on the disputed check was the latter's; that the first time the witness heard anything in reference to the disputed check was either the last part of August or first part of September, 1922; that a week or ten days after this Mrs. Wilkerson came to the bank with the disputed check; at that time Mrs. Wilkerson claimed that the check should have been for $15; that the witness took a magnifying glass and examined the check and discovered no erasures or changes in the check and called Mrs. Wilkerson's attention to this fact. The witness testified that the check given to Mrs. Smith on December 2, 1921 (Exhibit 760) in the sum of $15 was paid by the bank on December 10, 1921; that this check was in the possession of the defendant bank from December 10, 1921, to February 8, 1922, at which time deceased's account was balanced and his cancelled checks sent to him.

On cross-examination Mr. Calfee testified that "very probably" he and Mrs. Taylor, when the disputed check came to the defendant bank "made the remark that it was a pretty good size check;" he testified that the bank did not "pay much attention" to dates upon checks drawn upon it but "we look more to the signature." He testified that on December 4, 1922, he wrote a letter in answer to one received from deceased in which the latter said "something about a check being charged against his account that should not have been done." This letter of the witness was introduced in evidence. In it the witness stated in reply to deceased's letter that he would say that "there is only one thing that can be done in this matter if the check *is a forgery* Mrs. Smith would have to account for the check" and "that criminal proceedings would have to be resorted to as *forgery* was a felony," and "it would be necessary for the court to decide by experts on handwriting whether it is a *forgery*." (Italics ours.) At the trial the witness testified that in deceased's letter he claimed—". . . that

we had charged him up with a check that hadn't been given. . . . he hadn't used the word 'forgery' to my certain knowledge, or ever said anything about a forgery . . . If he claimed the check that he give for fifteen hundred dollars was not right, why, I told him that if it was a forgery, why, his recourse was to the grand jury."

On January 13, 1923, Mr. Calfee again wrote to deceased that the matter would have to be handled through the courts, that: "If this check is a *forgery*, the thing to do is to swear out a warrant for the arrest of the party that *forged the check*. (Italics ours.) He further testified that the first person who told him that the check was a forgery was the attorney for plaintiff on the day he came to the bank about the matter, which was about the 10th of March, 1923, and at that time the attorney left a paper signed by deceased notifying the bank that the disputed check was not signed by him or anybody with his knowledge or consent, and demanding credit for the sum of $1500 erroneously charged against his account by the bank by reason of the cashing of the disputed check; that at that time the *attorney* said the check was forged. (It here should be noted that the parties in their briefs and the witnesses at the trial have used the word "forgery" in the sense of a fabrication *in toto* of the disputed check including the signature of the maker as distinguished from a mere raising of the amount of the check.) Neither Calfee nor Taylor knew what became of any of the three letters that had been written by deceased. They testified that they always kept any correspondence that was considered of importance but even the notice served upon the bank in 1923 was not kept by the bank.

It is insisted that the court erred in not giving defendant's instruction in the nature of a demurrer to the evidence offered at the close of the whole case. The argument in support of this contention is largely based upon the claim that the verdict was against the weight of the evidence. In this connection it is first said that the action of plaintiff was unusual because, although he took the stand in his own behalf in order to show that service of the notice upon the bank on May 10, 1923, was duly made, he did not testify concerning the signature of deceased to the disputed check; that none of the latter's family or close friends who were no doubt familiar with his signature were called upon to testify. It is stated that Mrs. Wilkerson, the daughter of deceased, was in the court room but there is nothing in the record to so show. In this connection it is also stated that Judge COCKRELL's testimony is not to be considered because he did not show himself to be qualified to testify as an expert witness on handwriting.

Attention is called to the fact that when Mrs. Wilkerson went to the bank she did not claim that the disputed check was a "forgery" but merely that it had been raised. It is said that Mr. Taylor, cashier of the bank, visited deceased's home and in the presence of his son and daughter the claim was made by deceased that the check was

*raised,* but even this claim was abandoned upon an inspection of the check, a suggestion having been made about the absence of dots and marks which deceased usually put under his signature but an examination of another check showed the same discrepancy and the matter was then abandoned by deceased. It is claimed that while this suit was filed on May 11, 1923, the original petition did not claim that the check was a forgery but after deceased died an amended petition was filed in which for the first time it was alleged such was the fact; that the case was passed at the June term of court and the deposition of deceased was not taken in the case.

Attention is called to the fact that Alma Vanausdol, a granddaughter of deceased, took the witness stand and testified that she wrote a letter for her grandfather to the defendant bank in which he stated that the check was a forgery but the witness did not express an opinion as to whether the signature in dispute was genuine or otherwise; that plaintiff's witness, Martin, who testified that the sixty-eight checks introduced in evidence contained the genuine signature of deceased, also stated further that the disputed check contained the genuine signature of deceased; that plaintiff's expert witness, Shearman, testified that defendant's exhibits 30 and 31 and the signature on the back of 31, in his opinion, did not contain and was not the genuine signature of deceased notwithstanding the fact that plaintiff's witness Martin had identified these exhibits, as well as exhibit 32, as containing the genuine signature of deceased, and it is claimed that they were introduced in evidence as admittedly genuine. Defendant refers to the fact that the witness did not know whether defendant's exhibit 32 contained the genuine signature of deceased; that the witness testified that a tracing would usually show a stopping and lifting of the pen and that the disputed check showed less stopping and lifting than exhibit 760 (the one from which plaintiff claimed the check was traced); that thereafter this question was asked by the defendant of the witness—

"Q. . . . if 802 is the true signature of Mr. Vanausdol, the 760 would indicate a tracery of 802 because of the frequent lifts rather than continuous lines in the signature; is that correct? A. Read that question again. I don't know exactly whether I understand what you are driving at.

"Q. Well, let's confine ourselves to that question rather than what I am driving at. A. Read the question— I will say I don't know; that will shorten it up some."

Our attention is called to the fact that the witness testified that he was taking an expert's fee for his services at the time of the trial and for services rendered prior thereto.

It is said that Judge COCKRELL was handed some checks and that his testimony was merely the reading of notes or memoranda that he had prepared before the trial in reference to these checks; that thereafter

the court so ruled and counsel for plaintiff abandoned the idea of questioning Judge COCKRELL any further; that on cross-examination the judge was asked frequent questions as to the genuineness or otherwise of various signatures but in most instances he would not express an opinion at all, "thus clearly showing that he did not possess the requisite qualifications to testify as an expert."

It is true that none of the relatives of deceased testified on the question as to the genuineness of his signature to the disputed check. There is nothing in the record tending to show that they knew anything about his signature but defendant seems to assume because they were near relatives and showed an interest in the matter that they did have such knowledge. Even if such is to be assumed (a question we need not pass upon) their failure to testify was a matter for the attention of the jury and not this court. Mrs. Wilkerson, deceased's daughter, was not a party to this proceeding but it seems to be assumed by defendant that she was interested in the controversy as an heir of deceased. However, if she was interested in the result, the circumstances in reference to her calling at the defendant bank was a question for the jury. The fact that plaintiff and deceased's granddaughter were not asked concerning his signature was merely a circumstance for the attention of the jury, if throwing any light on the subject as to whether the disputed check was genuine. As to the testimony of Mr. Taylor, it was impeached by his deposition. Of course, his testimony was for the attention of the jury.

The original petition filed herein is not shown in the bill of exceptions as it evidently was not introduced in evidence, but it appears in the record proper. For this reason we cannot consider it so as to determine whether there is any inconsistency between it and the amended petition. [Shuff v. Kansas City, 257 S. W. 844, 845.] However, if we could consider it, it is well settled that facts alleged in an abandoned pleading are not to be taken as conclusive admissions on the part of the pleader. [22 C. J. 337, 338.] However, we have examined the two petitions and find that the second petition merely amplifies the allegations of the first, the first being founded upon mere charges, in effect, that defendant bank had improperly debited Vanausdol's account in the sum of $1500 without mentioning the forgery while the amended petition sets out that this debit was brought about by reason of the cashing by the defendant bank of the forged check. The allegations of the two petitions are not inconsistent.

Plaintiff's witness, Martin, was the assistant cashier of the defendant. He was put upon the stand by plaintiff for the purpose of showing the state of deceased's account at the bank and identifying the sixty-eight checks referred to as containing the genuine signature of deceased and to prove certain other matters. He was not asked by plaintiff as to whether the signature to the disputed check was genuine but on cross-examination he testified that it was. It now seems to

be the contention of defendant that plaintiff is conclusively bound by the testimony of defendant's officer on cross-examination notwithstanding all of the other evidence that plaintiff had upon the question at issue. We need only state the circumstances to show that defendant's contention is without merit. Exhibits 30, 31, and 32 were identified by Martin on cross-examination as containing the genuine signature of the deceased. The record fails to bear out the assertion that the signatures to these exhibits were admitted by plaintiff at the trial to be genuine.

The testimony of plaintiff's witness Shearman on cross-examination that we have quoted, was in answer to a question which appears to have been merely argumentative, if anything. Exhibit 760, which was the check from which it was claimed by plaintiff that the disputed check was a tracing, was admittedly genuine but the disputed check was exhibit 802. The question seems to have called for whether the admittedly genuine check was not a tracing of the disputed one. The question is hard to understand unless, as before stated, it is considered as merely argumentative. The witness seemed to have answered it in a supercilious manner by saying, "I will say I don't know, that will shorten it up some." It seems to be defendant's contention that on account of this circumstance the whole of the witness's testimony was discredited, although exactly what bearing it has upon the question is not pointed out. If the witness conducted himself in a manner to be criticised, his action was for the consideration of the jury.

We find upon an examination of the record that Judge COCKRELL testified that in his opinion the signature upon the disputed check was not the same as that upon the sixty-eight checks which contained the admitted signatures of deceased. It was not until after this testimony was given that any memorandum is referred to in the testimony and it would appear that the memorandum was not used in connection with this testimony but only when it came to the testimony concerning the handwriting on the face of the check *aside* from the signature thereto. Just what part of his testimony in reference to this matter was from the memorandum is not clearly shown in the record. When the motion to strike out was made, it was not directed to any particular part of the testimony, the motion merely being "to strike out all this testimony thus far which was given from the memorandum." The court ruled "Let the judge give his testimony like any other witness." The record does disclose that Judge COCKRELL would not express an opinion as to the genuineness of signatures other than on the sixty-eight checks aforesaid and the one in dispute purporting to be that of deceased. He stated that it would be necessary for him to give more study to the other signatures before expressing an opinion. It appears that the judge had the sixty-eight checks and exhibit 802 in his possession for some time for an examination before the trial.

The judge did not refuse outright to give his opinion on the other checks but stated that he required more time to study them.

The fact that defendant had eleven witnesses who testified that the disputed check was in their opinion that of Addison Vanausdol against the two produced by plaintiff who testified to the contrary, would merely go to the weight of the testimony. [Investment Co. v. St. Joseph, 191 Mo. 459.]

The testimony of Mrs. Smith and her daughter and brother was all for the attention of the jury. Mrs. Smith's testimony was impeached in part and a very strong circumstance tending to show that there was no consideration given for the $1500 check, is the fact that the $15 checks that deceased gave her each month after December 2, 1919, had a notation upon them that they were for board and *care* and the three checks given in December, 1919, and in January and February, 1920, indicate that the monthly checks he had theretofore given Mrs. Smith were for the same services. She gave no explanation as to why she accepted these checks with this notation upon them while she claimed at the trial, in the face of the notation, that the $1500 check was given for care.

It is claimed that the verdict was so against the weight of the testimony as to show passion and prejudice on the part of the jury, but, taking all of the circumstances, by themselves and together, relied upon by the defendant, we think there is nothing in the case but the mere weight of the testimony, all of which was for the jury and the trial court, and the jury with the approval of that court having found against defendant's contention, this court is not authorized to disagree. [Investment Co. v. St. Joseph, supra; Sanders v. Building & Loan Ass'n, 178 Mo. 674, 676; Weber v. Strobel, 194 S. W. 272; Sec. 5438, R. S. 1919.]

The granddaughter of deceased testified that she wrote a letter for her grandfather to defendant bank about December 1, 1922, and in this letter her grandfather notified the bank that the disputed check was a "forgery." The evidence shows that this letter was lost. It is claimed that this was mere self-serving testimony and the court should have sustained defendant's objection to it. It will be noted from our statement of the facts that one of defendant's main contentions was and is that deceased had never really claimed anything but that the disputed check had been raised and that his relatives were making a like claim. The testimony of the granddaughter concerning the contents of the letter tends to dispute this contention and was therefore admissible. However, we do not think that it was materially erroneous for the reason that the testimony of the president of the bank, together with the letters that he and Mr. Taylor wrote deceased, show beyond any dispute that deceased was claiming in the letters which he wrote the president and Taylor that the disputed check was a "forgery." Defendant's president testified that

deceased did not use the word "forgery" in his letters but the information that the witness said it did contain shows that a "forgery" was being claimed by deceased.

It is claimed that the court erred in refusing to permit defendant's witness, Josie Smith, to answer the following questions—

"Tell the jury, as best you can recollect, what Mr. Vanausdol did say to you about that check—after the children questioned. A. After the children questioned it? Q. Yes, what did Mr. Vanausdol say about it."

There was no offer of proof made in connection with this matter and for that reason alone defendant is not now in a position to complain. [State v. Roberts, 280 Mo. 669, 679.] However, what was sought to be elicited was shortly theretofore brought out by defendant because the witness was previously asked by it if deceased ever talked to her about the check and she answered—

"*Nothing more* than he showed me the check and told me that the children was displeased with it that he give me that much; he said that they said he gave me too much."

It is insisted that the court erred in admitting in evidence two large transparent photographs of plaintiff's exhibits 760 and 802, being the $15 check dated December 2, 1921, and the check in dispute. The record shows that the original exhibits were in evidence and before the jury. The photographs were made by the witness Shearman and used in connection with his testimony. The photographs were exact reproductions of the originals except as to size and color. The fact that they were transparencies made it possible to superimpose one upon the other so as to observe the tracing. We think that they were properly admitted as serving to illustrate and elucidate plaintiff's contention and tended to aid the jury in making a decision on the question of forgery. [26 C. J. 970; Marcy v. Barnes (Mass.), 16 Gray 161; Adams v. Ristine, 122 S. W. 126, 132; State v. Ready, 77 N. J. L. 329. 331; Sec. 5438, R. S. 1919.] There is nothing in the case of Greer v. Lumber & Mining Co., 134 Mo. 85, contrary to our holding in this matter. In that case the original was not introduced in evidence.

It is claimed that defendant was taken by surprise by the introduction of the photographs and it was deprived of the opportunity of having the other exhibits enlarged. The record fairly discloses that all the checks introduced in evidence by plaintiff were in the possession of defendant long enough before the trial for it to have made any photograph that it might have desired. Although defendant did not elect to make any photographs it was at liberty to have the jury examine all of these checks under a microscope, which would have had an effect very similar to having enlarged photographs of them made. [State v. Ready, supra, l. c. 331, 332; State v. Skillman, 76 N. J. L. 464, 465, 466.] However, we are cited to no case by the defendant

in support of its contention that these photographs were not admissible in evidence even though defendant had had no opportunity of having photographs of the others made. As we understand the law, a party has a right to use evidence within his possession in any legitimate way he may see fit and documents will not be excluded for the reason that the defendant may not have been in control of them or evidence in support of his contention bearing upon them. [See Art. 12, Chap. 12, R. S. 1919.]

It is insisted that the court erred in permitting Judge COCKRELL to testify as an handwriting expert because he did not show himself qualified to so testify. Judge COCKRELL testified that he was at present living in Warrensburg and was judge of the circuit court there; that he had studied handwriting "to a certain extent" beginning before he began the practice of law but chiefly since he became prosecuting attorney, which was about twenty years before the trial; that his study was carried on—

"Mostly in court, quite a bit when I was prosecuting attorney, and then kept it up since then, and then in court the last eight years since I have been judge.

"Q. You may just state to what extent you have had experience in the examination of handwriting and documents. A. Well, all the disputed, all the forgery cases, there was quite a number when I was prosecuting attorney. I examined all of those minutely, and since then in civil cases I kept it up. I was much interested in it; and then since I have been judge all the questioned documents, so-called, that came up I studied them, included quite a number of alleged forgeries and disputed writings, and I made some study outside of that, not particularly concerning handwriting, but with relation to handwriting and other features—national handwriting and mental characteristics and things of that sort. . . . when I was prosecuting attorney we had probably ten or twelve cases of forgery; I compared all of those, and since I been judge probably been several times that many.

"BY THE COURT: Compared exhibits, and so forth.

"THE WITNESS: Yes: yes, I compared the check or what the transaction was based on with admittedly genuine signatures, and while I was practicing I did quite a bit of that on defending on those matters.

"BY THE COURT: For the purpose of determining in your own mind as to the genuineness of the signature?

"THE WITNESS: Certainly, and the particular reasons, the particular differences, the characteristics of the handwriting."

It is unnecessary in a case of this kind that the person introduced as an expert witness be sworn to have followed the particular science, trade or art under which the matter under investigation would naturally come. But the witness's qualification depends more upon his

intelligence and means of knowledge. Skill and judgment in hand-writing is common to men of many callings although one calling may provide a better expert on this subject than another. The witness may not even expressly claim to be an expert. It is sufficient if he states facts showing that from experience he is competent to express an opinion as to the handwriting, and whether or not he is competent to give such an opinion is largely within the discretion of the trial court and will not be reviewed by the appellate courts under ordinary circumstances. [22 C. J. 779; Jones on Evidence, Civil Cases (3 Ed.), p. 555; Marcy v. Barnes, supra; State v. David, 131 Mo. 380, 391; Helfenstein v. Medart, 136 Mo. 615; Radford v. Ry. Co., 64 Mo. App. 475; McAnany v. Henrici, 238 Mo. 103, 113, 114; Turner v. Haar, 114 Mo. 335, 344.] We would not be justified in disagreeing with the trial judge in this matter.

It is insisted that the court erred in refusing to strike out the testimony of Judge COCKRELL "as soon as it became apparent that said witness was reading from a document prepared by him before the trial from a study of the check along with some of the other checks." We have already set forth what occurred at the trial in reference to this matter. When the motion to strike out was made, it appears from the remarks of the court that the latter thought that the witness was testifying from memoranda but the court did not directly pass upon the motion to strike out. No exception was taken to the action of the court in refusing to pass upon the matter and, in fact, no exception of any kind was saved at the time and, therefore, defendant is not now in a position to complain.

It is insisted that the court erred in admitting in evidence the deposition of defendant's witness, Josie A. Smith, which was taken in a different suit and where the parties were different, for the purpose of impeaching said witness upon an immaterial matter. The record discloses that over the objection of plaintiff, defendant, on direct examination of this witness, had the witness testify as to certain services which she stated she had performed for the deceased and that the disputed check was for his care and the $15 checks were for board alone. This the court admitted for the purpose of showing a consideration for the $1500 check, as bearing upon the question of forgery. The $15 checks show upon their face that they were for board and care and therefore there was a conflict between the checks themselves and Mrs. Smith's version of the transaction. Mrs. Smith testified that the $15 mentioned in the contract made in 1920 with deceased was "$15 a month for board each month." The part of the contract remaining after the piece was torn out, does not so state, so a legitimate inference arises that the part torn out had something to do with the consideration of the $15 monthly payments to be made by the deceased under it. Mrs. Smith stated that she had the only copy of the contract as no duplicate was made. At the trial the witness said that

the part torn out had nothing to do with the $15 monthly payment but that "what is taken out was that I didn't furnish the fruit, he was to substitute any fruit he wished." We, therefore, think it was competent to show that the witness had previously made a contradictory statement in the deposition where she stated that the part gone from the contract was in reference to deceased's board "for $15 a month," etc., and showing that she had made a statement that it was torn while in her hands, for at the trial she said it was torn out while it was in the hands of deceased. The jury had a right to infer that the tearing of the contract was an attempt to destroy evidence in contradiction of her claim as to what was the consideration for the $1500 check in dispute.

It is insisted that the court erred in giving defendant's instruction No. 2. The effect of this instruction was to tell the jury that the disputed check was not a tracing of the check of December 2, 1921, for the reason that there is a presumption of law that a check is written on the date it bears, and as the evidence shows that the $15 check was cashed on December 10, 1921, and was thereafter in the custody of the defendant until February 8, 1922, there could not have been a tracing of it in the making of the $1500 check because the latter was dated December 12, 1921, or at the time the former was in the hands of the bank. Of course, this instruction was properly refused. All that defendant was entitled to, if not more, upon this subject was presented in defendant's given instruction No. 4, which reads as follows:

"The court instructs the jury that the presumption of law is that a check was written on the day it bears date and before you can disregard this presumption it devolves upon the plaintiff to prove by a preponderance of the credible testimony in the case, that the check for $1500 dated December 12, 1921, and known as Plaintiff's Exhibit No. 802 was written on some date other than December 12, 1921.

It is insisted that the court erred in refusing defendant's instruction No. 9, which sought to tell the jury that if they believed from the evidence that Addison Vanausdol signed the $1500 check or "if there is any doubt in your mind as to whether or not" he did so, the verdict must be for the defendant. This is not a criminal case and it was not a question of "any doubt" or even reasonable doubt but merely the preponderance of the testimony, and the instruction was properly refused.

The judgment is affirmed. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.