Lanta HURSH, Mary B. Roddy, Ben F. Crook and Lee Jarvis Crook, Respondents,

v.

Laura CROOK, individually and Laura Crook, Executrix, Appellant.

No. 45073.

Supreme Court of Missouri.

Division No. 2.

July 9, 1956.

Delton L. Houtchens, Clinton, for appellant.

Belisle & Harris, John M. Belisle, and Morran D. Harris, Osceloa, for respondents.

BOHLING, Commissioner.

This is a will contest involving the title to real estate. The sole issue presented was whether the signatures of the testator and the witnesses to the will were their actual and genuine signatures. The yer-

dict and judgment was against the validity of the will. Proponent has appealed and contends that the verdict is not supported by any substantial evidence and that the court erred in the admission and exclusion of certain evidence.

Lee E. Crook, the testator, died March 16, 1953, at the age of 83.. Mrs. Crook was then 55. He had practiced law at Osceola, Mo., for many years. He was twice married. Contestants, Lanta Hursh, of Kansas City, Kan., Mary B. Roddy, of Lansdowne, Pa., Ben F. Crook, of near Osceola, Mo., and Lee Jarvis Crook of New Orleans, La., are children of his first marriage. His first wife died September 19, 1918. On March 25, 1923, he married Laura Crook, who, as an individual and executrix, is proponent. Contestants and proponent are testator's only heirs at law.

. All of Mr. Crook's children attended his funeral, March 19, 1953, some having arrived prior to his death. Mr. and Mrs. Hursh, Lee Jarvis Crook, Mary Roddy, Laura Crook, the widow, and Edwin W. Mills, the prosecuting attorney, went to Mr. Crook's office the day following the funeral to determine if Mr. Crook left a will. We understand he had a one-room office, having a fireproof vault or safe, roll-top desk, tables and other furniture. His papers were not kept in an orderly fashion but were scattered about his office, on top of furniture, in pastboard boxes, sacks, pigeonholes in his roll-top desk and elsewhere. Mr. Mills testified he was there for about two hours in the afternoon. Mrs. Crook testified they made a pretty thorough search of the safe and top of the roll-top desk. Mrs. Roddy testified they took every paper out of the safe and found a number of Government bonds, some in the names of Mr. and Mrs. Crook, and others in the name of Mr. Crook which she listed. Mrs. Crook testified they found $1,700 in Government bonds of Mr. Crook in the safe. Mrs. Roddy stated they examined each and every article on the desk, in the pigeonholes and in the drawers of the desk; and also looked under the desk; that they were

there all day, morning and afternoon, and that they concluded there was no will. This resulted in the taking out of letters of administration of an intestate person's estate, and Mrs. Crook was appointed administratrix of the estate of Lee E. Crook, deceased.

Mrs. Crook testified that on May 16, 1953, she again went to the office preparatory to moving her husband's effects; that the lower right-hand drawer of his desk was a single drawer but had the appearance of being two drawers, and there were "no pulls on either the top or the bottom of this partition"; that she had never looked in that drawer; that she took the upper drawer out, then pushed the lower drawer out, and found "an old leather collapsible filing case," or portfolio, with a sealed envelope in it with the notation "Last Will and Testament of Lee E. Crook." She took the envelope to Probate Judge George Anderson's office and they went to Mr. Mills' office. Mr. Mills opened the envelope and in it was the will here involved.

Mrs. Roddy testified that on March 19, 1953, when they went to Mr. Crook's office to search for a will: "I know that there were no portfolios, there was nothing of that kind in the desk, I remember that very distinctly."

The will was admitted to probate and Mrs. Crook was appointed executrix on May 16, 1953. Ralph P. Johnson was appointed administrator pendente lite.

The alleged will was "Defendant's Exhibit 3." It first directs the payment of testator's just debts, funeral expenses, etc., out of his personal estate. Testator next gives to each of his children, naming them, the sum of $1.00. Testator next devises, bequeaths and wills the residue of his estate, real, personal and mixed, to his wife, Laura E. Crook, to be her property absolutely. The next paragraph of the will provides: " * * * that any one or more of my heirs who takes legal steps to change the terms of my will or in anyway contest or litigate the validity of this instrument, for-

feits any and all rights and legacies thereunder." Testator next appointed his wife executrix, with the request she be permitted to serve without giving bond. The will is dated November 11, 1946, and purports to be executed by "Lee E. Crook" as testator and by "Herman Pufahl" and "Waldo P. Johnson" as attesting witnesses.

There was testimony that Waldo P. Johnson and Herman Pufahl, lawyers living, respectively, at Clinton and Bolivar, Mo., were in Osceola attending court on November 11, 1946. They predeceased Mr. Crook. Mr. Johnson died January 20, 1952. Mr. Pufahl died March 6 or 7, 1953.

Mrs. Crook, Mr. Mills and Judge Anderson testified that the signatures of the testator and attesting witnesses appeared clear when Mr. Mills took the document out of the sealed envelope, and not blurred or smeared as at the time of trial. The second sheet of the will has two or three holes caused by the paper being scorched. Mr. Mills was of opinion something damp had caused the ink to smear. Charles Scott, an examiner of questioned documents, contestants' witness, stated when he received the will the signatures of the attesting witnesses were smeared, which could be the result of something accidental like a "sweaty arm," and made his work more difficult; that the "Lee E. Crook" signature was not smeared when he received it, but after he returned it that signature "had been smeared," and that now there were holes in the second sheet.

Mrs. Crook testified that the smears on the signatures first appeared when contestants returned the will after having it examined by Mr. Scott. Scott testified it was returned in the condition in which he received it. Judge Anderson testified contestants sought and secured an order of court to remove the will for the purpose of examination; and, when returned, it was "just like it was when it was taken out." Mrs. Crook testified she secured the will and took it to her cabin. About 6:00 p. m. she walked to the mail box, about a quarter

of a mile. When she returned, the house had been ransacked and the will was on the cookstove and the second page was scorched. She returned it the next day, having it about sixteen hours. Judge Anderson testified that Mrs. Crook, on a Tuesday, wanted to take the will home with her and he refused her request. She returned in a short time and stated Mr. Mills would stand responsible and she wanted to send it " 'to an expert to have it tested.' " He then got it from his lockbox in the bank and gave it to her. It was in the same condition it was when he first saw it. She returned it the following Saturday, and it was then in the condition it is now. Mrs. Crook again secured the will and testified she sent it to Washington, D. C. Judge Anderson testified that this time she signed a receipt reading: "October 30th, 1954. Received from Geo. Anderson the will of Lee E. Crook for the purpose to have it tested by expert. Laura E. Crook."

Mrs. Crook testified that she put receipts and other important papers in the fourth drawer of a chiffonier at the home; that on May 18, 1953, two days after finding the will, she found a sealed envelope in the drawer with "Mrs. Laura E. Crook" written on it by Mr. Crook. The envelope contained a six-page handwritten letter dated "Mar. 3, 1953," and addressed to her thus: "Sweetheart." She testified that the letter was in the handwriting of Mr. Crook. Cleo Cauthon, Edwin W. Mills, Glen E. Toalson, Josephine Carroll, and perhaps other of proponent's witnesses, testified that in their opinion the letter was in Mr. Crook's handwriting. Proponent offered the letter in evidence as bearing on Mr. Crook's mental condition and the objects of his affection "and not for the truth of the matters stated therein." The letter is "Defendant's Exhibit 4." The letter mentions their approaching wedding anniversary; speaks of the assistance, service and loyalty of Mrs. Crook to the writer; that he had made a will, witnessed by Herman Pufahl and Waldo Johnson, on November 11, 1946, giving her all his property; that he had been fair to his

children; that "Billie" [Ben F.] needed an operation and for her to sell land owned by his mother; and that Billie should do better since he was out of the asylum.

Mrs. Crook, George Anderson, Edwin W. Mills, Cleo Cauthon, Aubrey Park, and other witnesses testified that Mr. Crook was at all times of sound mind. There was testimony by Mrs. Crook and other witnesses to the effect that Mr. Crook had great affection for his wife.

Contestants never questioned Mr. Crook's mental soundness or indicated that he had been subjected to undue influence. When the subject of Mr. Crook's affection for his wife first came up, contestants stated it was not an issue in the case; and when inquiry was first made concerning Mr. Crook's mental soundness, contestants stated there was no question about his mental capacity.

Proponent had a number of lay witnesses who testified with respect to the different signatures on the alleged will, expressing their opinion that the signatures were genuine. Space will not permit the detailing of all of this testimony.

With respect to the signature "Lee E. Crook": Mrs. Crook testified: "It is absolutely the genuine signature of Lee E. Crook."

Cleo Cauthon, who had served eight years as circuit clerk and ex officio recorder: "Well, I would say it was." He stated that Mr. Crook "always sort of shaded his writing," and made flying strokes; that when you shade the stroke feathers out, but this signature on the will was "sort of blunt," "fairly blunt," did not feather out a lot; that Mr. Crook always had a straight pen in his office, but a short fountain pen would influence the shading; that he did not recall Mr. Crook having a fountain pen but had seen him use one in the circuit clerk's office.

Probate Judge George Anderson: "Well, it looks very much like it."

Edwin W. Mills, who had been prosecuting attorney of St. Clair county for six terms and had been associated with Mr. Crook in the trial of cases: "I believe that's his genuine signature."

Glen E. Toalson, an abstractor for 35 years at Osceola, was well acquainted with Mr. Crook, Mr. Johnson and Mr. Pufahl, thought he knew their signatures, and stated: "It is my opinion that these three signatures are all originals."

Aubrey Park, who had served as circuit clerk for eight years, stated: "In my opinion that's his signature"; but on cross-examination stated if the signature were traced off of an original he would have no way of knowing.

Josephine Carroll started doing Mr. Crook's stenographic work in 1931 and after becoming deputy circuit clerk four years later continued doing his work, Mr. Crook bringing it to the circuit clerk's office. He always used a straight pen in the office but sometimes used a fountain pen in the clerk's office. She testified: "It looks like it is Mr. Crook's signature." She did not type the will.

Mrs. Augusta H. Graham, who had worked at the bank of Osceola for 20 years or more, and handled hundreds of Mr. Crook's checks, stated: "I consider it so."

Other lay witnesses giving testimony to like effect were Tell O. Daniels, Charles E. Higgins, Emma Parker, George W. Davies.

Other testimony on behalf of proponent with respect to the signature "Herman Pufahl": Mrs. Lorraine Leavitt was Herman Pufahl's granddaughter and had served as his secretary for thirteen years. She stated: "Well, I think it is." Herman A. Pufahl, son of Herman Pufahl, testified it was his father's signature. Cleo Cauthon: "I believe that one is." Josephine Carroll, who had seen Mr. Pufahl's signature a number of times, stated: "That looks like Mr. Pufahl's signature."

Other testimony on behalf of proponent with respect to the signature "Waldo P.

Johnson": Miss Helen M. Johnson, his sister, testified: "In my opinion it is"; but on cross-examination stated she would not know whether some one had duplicated it. F. Kirk Maddrix, whose interrogatories were introduced, stated he was associated with Mr. Johnson in the War Crime trials in Japan in 1946, and it was his opinion, subject to the qualification he was not an expert, that the signature of Mr. Johnson appeared on the will. Mrs. Augusta H. Graham worked at a bank in Osceola of which Waldo P. Johnson was president part of the time, and stated: "I think that's Mr. Johnson's signature." George W. Davies gave like testimony.

The contestants offered the following witnesses.

Mrs. Waldo P. Johnson testified that Mr. Johnson and she were married December 18, 1912, and she had had many occasions to observe her husband's signature; that her husband's signature appeared on certain specified exhibits in the case; that, when handed the will, she had examined it at the request of her husband's brother, Ralph P. Johnson; and "couldn't be sure" whether the "Waldo P. Johnson" on the will was her husband's signature or not; "There is a little something there that didn't look just right. It looks very much like it."

Ralph P. Johnson, brother of Waldo and a practicing lawyer for about fifty years, was not asked about the signatures on direct examination. The cross-examination developed he testified when the will was probated that all the signatures were the genuine signatures of the respective parties; but he stated that since then he had made further examination and comparison of his brother's signature on letters to him, and while he could not point out any differences, the signature did not look "as much like Waldo's signature as I thought it did when I testified in the Probate Court"; and that he did not want to express an opinion at this time as to the other signatures on the will.

The alleged will was submitted, as stated, to Charles Scott, an examiner of questioned documents. He told of his experiences as an examiner of questioned documents and of the equipment in his laboratory for making examinations. No point is presented respecting his qualifications. He made a true and accurate photograph of the exhibits in life-size form virtually at once to show the condition in which he received them. He testified that the signatures when examined in life-size appeared to be genuine because they were correct in form; but it was easy to duplicate the form of a signature and signatures are not identified by mere form. He enlarged to exactly the same scale photographs of the signatures of Lee E. Crook, Herman Pufahl and Waldo P. Johnson on the will and signatures established to be the genuine signatures of said respective persons written on other instruments near the same date. These were studied by him and, upon their being introduced in evidence, he explained his examination and study of the writings made under a microscope et cetera, and pointed out in detail the differences between different letters of the three signatures on the will and the respective letters of known genuine signatures of said persons. He found no evidence Mr. Crook had to draw any part of his signature. He stated the signatures on the will were not the product of the brain as one writes his signature but the product of the eye and hand, showing plainly, when magnified, they were drawings; that the Lee E. Crook on the will was a careful drawing of some genuine signature of Mr. Crook and did not show the life, vigor, shading, speed, rhythm and fluency of his genuine signatures; but disclosed a line movement without quality, a slow, careful drawing without shading, with hesitations and breaks in pressure, with abrupt endings. The witness also compared the signatures of the attesting witnesses with known originals, with sim-

ilar results. He stated the questioned signatures were tracings; that there was no evidence of pencil or carbon markings and, in his opinion, the tracings were made with a light behind an original signature of the individuals involved, something like light boxes used in some mimeograph work, and the tracings were made by the same person. Mr. Scott testified he was to receive a fee of $850 for his preliminary examination, his preparation for trial, appearance as a witness and his expenses; that he was not concerned with the outcome of the case; that he had been available for a period of approximately fifteen months, and the charge was in line with that made by others doing like work.

 Proponent states she knows appellate courts do not weigh the evidence, Machens v. Machens, Mo., 263 S.W.2d 724, 734 [16]; Chambers v. Chambers, Mo.App., 74 S.W.2d 104, 110, 111; but contends the verdict is not supported by any substantial evidence and the judgment should be reversed with directions to enter a judgment sustaining the paper writing as the will of Lee E. Crook. Proponent's presentation does not develop the testimony of Charles Scott but criticises his charge of $850 for preparation for the trial and appearance as a witness. His testimony was substantive evidence establishing contestants' case; its weight being for the jury. Vanausdol v. Bank of Odessa, 222 Mo.App. 91, 5 S.W.2d 109, 116 [10, 18, 19]. Section 490.640 (statutory references are to RSMo 1949 and V.A.M.S.), reads: "Comparison of a disputed writing with any writing proved to the satisfaction of the judge to be genuine shall be permitted to be made by witnesses, and such writings and the evidence of witnesses respecting the same may be submitted to the court and jury as evidence of the genuineness or otherwise of the writing in dispute." In Klaus v. Zimmerman, Mo.App., 174 S.W.2d 365, 369 [7, 8], the testimony of contestant and his father, who professed familiarity with deceased's signature, that the signature was not the signature of deceased was held sufficient to make the issue one for the jury. The contention is overruled.

Proponent contends error was committed in rejecting her offer of proof by witnesses Lola Boswell, Verdie Mae Booth and Jake Thompson of separate statements made by Mr. Crook to the witnesses in 1950, four years after the date of the alleged will, concerning his feelings for Mrs. Crook and his children and that he had executed a will in favor of Mrs. Crook; which testimony, proponent states, "should have been received not for the truth of the matters stated but for the reason that in proving due execution of the will by the testator these statements showed: (1) The testator's mental condition at the time which was shortly after the making of the will, (2) The state of the testator's affections and his attitude toward his wife, Laura Crook, and (3) The testamentary capacity of the testator." Proponent stresses Gibson v. Gibson, 24 Mo. 227, 228, 234; Thompson v. Ish, 99 Mo. 160, 170(I), 12 S.W. 510, 512(1), 17 Am.St.Rep. 552; Carl v. Gabel, 120 Mo. 283, 294(I), 25 S.W. 214, 217(1); Major v. Kidd, 261 Mo. 607, 626, 170 S.W. 879, 883.

 So far as material § 468.130 authorizes male persons "twenty-one years of age and upward, of sound mind" to make wills. Section 468.580 directs that when an appropriate petition to contest or to establish a rejected will is lodged in the circuit court "an issue shall be made up whether the writing produced be the will of the testator or not." See also § 468.500. Thus, proponent has the affirmative of the stated issues and ordinarily the onus of establishing testator's meeting the statutory requirements. Tingley v. Cowgill, 48 Mo. 291, 295; Benoist v. Murrin, 58 Mo. 307, 321. The proceeding is in effect an appeal from the probate court proceedings. Major v. Kidd, supra; Weaver v. Allison, 340 Mo. 815, 102 S.W.2d 884, 885, 110 A.L.R. 672. The usual procedure under the statutes is for pro-

ponents to make formal proof and establish the prima facie validity of the will—its execution, attestation, and testator's age and mental soundness. Contestants then go forward and endeavor to establish the alleged grounds of invalidity. Proponents follow with evidence in rebuttal and to fortify their prima facie case. Lareau v. Lareau, Mo., 208 S.W. 241, 243 [2]; Lindsay v. Shaner, 291 Mo. 297, 236 S.W. 319, 320; Denny v. Hicks, 222 Mo.App. 1206, 2 S.W. 2d 139, 140 [1]. Statutory will contests have some peculiar features; but, as pointed out in Teckenbrock v. McLaughlin, 209 Mo. 533, 538(I), 108 S.W. 46, 47(1), it is not the rule in Missouri in will contest actions that courts may not say there is no substantial evidence to sustain a certain issue and may not direct a verdict one way or the other on uncontradicted evidence on an issue. In this respect will contests are on the same footing as ordinary law actions; and in appropriate circumstances the court may direct the findings, including the issue of a testator's soundness of mind, where the facts and legitimate inferences are so strongly for or against the will as to leave no room for reasonable minds to differ. Patton v. Shelton, 328 Mo. 631, 40 S.W.2d 706, 711 [6, 7]; Morrow v. Board of Trustees of Park College, 353 Mo. 21, 187 S.W.2d 945, 956 [10–12]; Walter v. Alt, 348 Mo. 53, 152 S.W.2d 135, 143, 145, and cases cited in said authorities.

 The sole issue in the instant case was the genuineness of the signatures of the purported testator and witnesses. The proponent proceeded with her whole case before contestants were heard on the sole issue for determination, and established her husband's soundness of mind and affection for her. Proponent's authorities, mentioned supra, are to the effect that verbal declarations of a testator, so far as here material, subsequent to the execution of the will, absent some other controlling factor, are admissible, not to establish the facts stated but, as external manifestations of testator's mental condition, soundness of mind or state of affections, in instances wherein such issues are for determination by the jury. Contestants, by objections interposed, made known that neither undue influence nor testamentary incapacity was an issue in the instant case. Walton v. Kendrick, 122 Mo. 504, 518(I), 27 S.W. 872, 875, 25 L.R.A. 701, held testator's statement that he did not sign the will but his daughter " ' "Katie wrote my name, and I saw her do it" ' " was inadmissible. Wills are to be " 'signed by the testator, or by some person by his direction, in his presence.' " R.S. 1889, § 8870; now § 468.150. See also Wells v. Wells, 144 Mo. 198, 203, 45 S.W. 1095, 1096; Gibson v. Gibson, supra, 24 Mo. loc. cit. 236. Bergman v. Supreme Tent, Knights of Maccabees, 203 Mo.App. 685, 220 S.W. 1029, 1034, states that declarations of a testator, not a part of the res gestae, that he made a will are hearsay and inadmissible. Proponent's authorities do not establish error.

 Herman A. Pufahl drove Herman Pufahl, his father, from Bolivar to Osceola November 11, 1946. The court refused proponent's offer of a statement by the father to the son when he came to the automobile to return to Bolivar to the effect that " 'Lee Crook finally drew a will and I witnessed it' ", et cetera, offered as a part of the res gestae. Whether this statement was made immediately after the execution of the will or "within a matter of minutes or hours on the same day that the will of Lee E. Crook was executed," as stated by counsel in making the offer of proof, it appears that attesting witness Pufahl was speaking about the event and the event was not speaking through the attesting witness. The trial court ruled correctly. Sconce v. Jones, 343 Mo. 362, 121 S.W.2d 777, 782; German Evangelical Bethel Church v. Reith, 327 Mo. 1098, 39 S.W.2d 1057, 1065 [19], 76 A.L.R. 604; Schroeder v. Rawlings, 344 Mo. 530, 127 S.W.2d 678, 681 [4]; Wilson v. Toliver, Mo., 285 S.W.2d 575, 584.

■ Proponent claims error in the admission of contestants' Exhibits Nos. 2, 7, 40 and 41; citing 2 Wigmore, Evidence, § 315(1). Contestants say they were admissible on the issue of intent.

Mrs. Ethel B. Crook filed a demand, founded upon a note which, we understand, had been kept alive by partial payments, against the estate of Lee E. Crook, deceased.

Mrs. Lizzie Crook filed a demand, founded upon a $200, principal amount, note, dated in 1937, upon which a payment had been made in 1945, against said estate.

These demands were allowed by the probate court. Soon thereafter proponent produced Exhibits 2 and 7, and other papers to her attorney. He filed motions for rehearing on said demands because of these papers and the said exhibits and other papers were offered in evidence in the probate and circuit courts in opposition to the demands.

Said Exhibit No. 2 purported to be a check for $850 issued by Lee E. Crook on October 22, 1943, payable to J. E. Crook and Ethel Crook, with the notation "Loan no interest," and endorsed: "I promise to pay. J. E. Crook, Ethel Crook by J. E. Crook, duly authorized agent to sign for Ethel Crook." Contestants' Exhibit No. 4, also produced by proponent to her attorney and used in opposition to said demand, briefly, purported to be an authorization to J. E. Crook, under date of October 22, 1943, to "sign my name as joint endorser" on a check for $850 received from Lee E. Crook, signed "Ethel Crook." Exhibit No. 2 bears the stamp of the bank: "Paid. Oct. 23, 1943."

Said Exhibit No. 7 purports to be a check for $140 issued by Lee E. Crook on May 20, 1941, payable to Lizzie Crook, with the notation "Apply on note", and endorsed: "Lizzie Crook. J. L. Crook." Exhibit 7 bears the stamp of the bank: "Paid. May 26, 1941."

Contestants' Exhibits 40 and 41 are groups of four photographs each of said Exhibits 2 and 7, respectively.

Both Ethel B. Crook and Lizzie Crook testified, in effect, that they had never seen the said exhibits prior to their production in court on behalf of the estate, and that the respective purported signatures were not their signatures. Charles Scott testified that said Exhibits 2 and 7 were not original checks, but had been altered and showed erasures of the "fill-ins" of the blanks and evidence of "underwriting" or "tracing over." Contestants further established by an official in charge of the records of the bank on which the checks were drawn, that on October 23, 1943, only one check for $2.25 had been charged against Lee E. Crook's account; and that on May 26, 1941, the only check charged against Lee E. Crook's account was a check for $11.

Proponent testified that some time after finding the will she found said Exhibits 2 and 7 and other papers in her husband's desk and took them to her attorney. Proponent argues there was no evidence connecting her with the forgeries of these instruments. She admits she produced them and her testimony as to how they came into her possession was for the jury. The bank records, photographic exhibits and the testimony of Ethel B. Crook and Lizzie Crook establish they were forgeries. The evidence tends to establish fraudulent intent and was admissible. Davis v. Vories, 141 Mo. 234, 241(III), 42 S.W. 707, 709(3); Hobbs v. Boatright, 195 Mo. 693, 727, 93 S.W. 934, 939, 5 L.R.A.,N.S., 906, 113 Am.St.Rep. 709; State v. Stark, 202 Mo. 210, 222(9), 100 S.W. 642, 645(9); State v. Hodges, 144 Mo. 50, 53, 45 S.W. 1093, 1094; Manheimer v. Harrington, 20 Mo. App. 297, 301; Rice v. Lammers, Mo.App., 65 S.W.2d 151, 154 [8, 9].

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BOHLING, C., is adopted as the opinion of the court.

All concur.